No. 23-16038

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

ORACLE INTERNATIONAL CORP., a California corporation; and
ORACLE AMERICA, INC., a Delaware corporation,

*Plaintiffs-Counterdefendants-Appellees,*

*v.*

RIMINI STREET, INC., a Delaware corporation; and
SETH RAVIN, an individual,

*Defendants-Counterclaimants-Appellants.*

---

On Appeal from the United States District Court
For the District of Nevada (Hon. Miranda M. Du)
No. 2:14-cv-01699-MMD-DJA

---

## UNDER SEAL

## OPENING BRIEF FOR APPELLANTS RIMINI STREET, INC.
## AND SETH RAVIN

---

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
(202) 682-7511
Mark.Perry@weil.com

Jeremy M. Christiansen
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Samuel G. Liversidge
Eric D. Vandevelde
Blaine H. Evanson
Ilissa S. Samplin
Casey J. McCracken
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(949) 451-3805
BEvanson@gibsondunn.com

*Attorneys for Defendants-Appellants Rimini Street, Inc. and Seth Ravin*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel of record certifies that Appellant Rimini Street, Inc. is a publicly traded corporation and has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock. Appellant Seth Ravin is an individual.


Dated: March 4, 2024

s/ Blaine H. Evanson<br>
Blaine H. Evanson

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................ 4

ISSUES PRESENTED ................................................................................ 4

CONSTITUTIONAL AND STATUTORY PROVISIONS ....................... 5

STATEMENT OF THE CASE ................................................................... 5

    I.    *Rimini I*. ....................................................................... 6

    II.    *Rimini II* .................................................................... 7

SUMMARY OF THE ARGUMENT .........................................................11

STANDARDS OF REVIEW .....................................................................14

ARGUMENT .............................................................................................14

    I.    The District Court Applied a Legally Erroneous Definition of "Derivative Works." ........................................15

        A.    Derivative Works Must Actually Incorporate Protected Expression. ...........................................16

        B.    The District Court's Erroneous Definition of Derivative Works Would Stifle Competition and Creativity. ....................23

        C.    The District Court Also Erred by Ignoring PeopleSoft Licenses That Permit the Creation of Derivative Works. ........25

    II.    The District Court Erred by Striking Rimini's Section 117(a) Defense. ..........................................27

        A.    Oracle's Licensees Are the Owners of a Copy of a Computer Program. ...............................29

        B.    Section 117(a) Protects Rimini's Conduct. ..............................35

III.  The District Court Erred in Construing the Database and PeopleSoft Licenses. ..........................................38

    A.  Erroneous Imposition of "Facilities" Restriction (Database). .............................................38

    B.  Erroneous Construction of "Internal Data Processing Operations" (PeopleSoft). .......................39

IV.  The District Court Erred in Applying the Lanham Act to Statements of Opinion and Puffery. ..................47

V.  The Permanent Injunction Is Contrary to Law and Equity.................54

    A.  The Injunction Is Overbroad. ...................54

    B.  The District Court Erred in Enjoining *Non-Infringing* Materials to Punish *Past* Infringement. ...................56

CONCLUSION ..............................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariix, LLC v. NutriSearch Corp.,*
985 F.3d 1107 (9th Cir. 2021)....................................................................48, 51

*ASARCO, LLC v. Union Pac. R. Co.,*
765 F.3d 999 (9th Cir. 2014)......................................................................14

*Brown v. Madison Reed, Inc.,*
2023 WL 8613496 (9th Cir. Dec. 13, 2023)................................................52

*Brownstein v. Lindsay,*
742 F.3d 55 (3d Cir. 2014)..........................................................................22

*Cmty. for Creative Non-Violence v. Reid,*
490 U.S. 730 (1989)....................................................................................33

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013)....................................................................14

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.,*
911 F.2d 242 (9th Cir. 1990)................................................. 47, 48, 50, 51, 53

*Desire, LLC v. Manna Textiles, Inc.,*
986 F.3d 1253 (9th Cir. 2021)....................................................................14

*Drives & Controls Servs., Inc. v. Elec. Tech. Serv. & Repair, Inc.,*
2010 WL 11597884 (D. Wy. Feb. 12, 2010)..............................................24

*Dubin v. United States,*
143 S. Ct. 1557 (2023)................................................................................17

*Easom v. US Well Servs., Inc.,*
37 F.4th 238 (5th Cir. 2022)........................................................................17

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006)....................................................................................56

*Edmundson v. Procter & Gamble Co.,*
537 F. App'x 708 (9th Cir. 2013)................................................................48

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Effects Assocs., Inc. v. Cohen*,
908 F.2d 555 (9th Cir. 1990)..............................................16

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
69 F.4th 665 (9th Cir. 2023)..............................................51

*Ets-Hokin v. Skyy Spirits, Inc.*,
225 F.3d 1068 (9th Cir. 2000)..............................................19, 22

*AE ex rel. Hernandez v. Cnty. of Tulare*,
666 F.3d 631 (9th Cir. 2012)..............................................14

*Hiller, LLC v. Success Grp. Int'l Learning All., LLC*,
976 F.3d 620 (6th Cir. 2020)..............................................22

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)..............................................16, 18

*Krause v. Titleserv, Inc.*,
402 F.3d 119 (2d Cir. 2005)..............................................12, 29, 32, 33, 34, 35, 36, 37

*Latimer v. Roaring Toyz, Inc.*,
601 F.3d 1224 (11th Cir. 2010)..............................................23

*LEGO A/S v. ZURU Inc.*,
799 F. App'x 823 (Fed. Cir. 2020)..............................................23

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
964 F.2d 965 (9th Cir. 1992)..............................................16, 17, 19, 21, 24, 25

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
629 F.3d 928 (9th Cir. 2010)..............................................14, 16, 18, 27

*Micro Star v. Formgen Inc.*,
154 F.3d 1107 (9th Cir. 1998)..............................................17, 19, 20

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008)..............................................47, 48, 50, 51

iv

*Oracle USA, Inc. v. Rimini St., Inc.*
  879 F.3d 948 (9th Cir. 2018)................................................ 1, 5, 6, 14, 35, 39, 40

*Oracle USA, Inc. v. Rimini St., Inc.*,
  783 F. App'x 707 (9th Cir. 2019)...............................................................7, 14

*Oracle USA, Inc. v. Rimini St., Inc.*,
  81 F.4th 843 (9th Cir. 2023)................................................. 6, 7, 14, 38, 40, 41

*Padash v. I.N.S.*,
  358 F.3d 1161 (9th Cir. 2004)........................................................................31

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007).......................................................................22

*Price v. City of Stockton*,
  390 F.3d 1105 (9th Cir. 2004)..................................................................54, 55

*Princeton Payment Sols., LLC v. ACI Worldwide, Inc.*,
  2014 WL 4104170 (E.D. Va. Aug. 15, 2014).................................................37

*Rimini St., Inc. v. Oracle Int'l Corp.*,
  2020 WL 5531493 (D. Nev. Sept. 14, 2020)..................................................35

*Rimini St., Inc. v. Oracle USA, Inc.*,
  139 S. Ct. 873 (2019)....................................................................................16

*Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*,
  761 F. Supp. 2d 367 (E.D. Va. 2011) .............................................................37

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020)..........................................................................57

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)......................................................................................23

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997).....................................................48, 50, 51, 53

**TABLE OF AUTHORITIES**
**(continued)**

right
**Page(s)**

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*,
 421 F.3d 1307 (Fed. Cir. 2005) .........................................................28

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*,
 24 F.3d 1088 (9th Cir. 1994) ............................................................47

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
 292 F.3d 512 (7th Cir. 2002) .............................................................18

*UMG Recordings, Inc. v. Augusto*,
 628 F.3d 1175 (9th Cir. 2011) .....................................................29, 34

*Vault Corp. v. Quaid Software Ltd.*,
 847 F.2d 255 (5th Cir. 1988) ......................................................22, 28

*Vernor v. Autodesk, Inc.*,
 621 F.3d 1102 (9th Cir. 2010) .................................................12, 29, 30

*Warner Bros. Entm't Inc. v. RDR Books*,
 575 F. Supp. 2d 513 (S.D.N.Y. 2008) .............................................18

*Young v. City of Simi Valley*,
 216 F.3d 807 (9th Cir. 2000) ............................................................56

*ZilYen, Inc. v. Rubber Mfrs. Ass'n*,
 935 F. Supp. 2d 211 (D.D.C. 2013) .................................................37

**Statutes**

17 U.S.C. § 101 ....................................................................................17

17 U.S.C. § 103 ....................................................................................18

17 U.S.C. § 117(a) ...............................................................2, 27, 31, 32, 36

17 U.S.C. § 202 ....................................................................................31

17 U.S.C. § 502(a) ..........................................................................54, 57

**Other Authorities**

Dennis S. Karjala, *Harry Potter, Tanya Grotter, and the Copyright Derivative Work*, 38 Ariz. St. L. J. 17 (2006)...................................................21

Melvin B. Nimmer & David Nimmer,
*Nimmer on Copyright* (2021) ............................................ 16, 18, 22, 23, 31, 54

**Rules**

Fed. R. App. P. 4(a)(4)(B)(i)....................................................................................4

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8....................................................................................24

**INTRODUCTION**

Rimini is Oracle's primary competitor in the market for support services for Oracle enterprise software products. Oracle controls 95% of that market and maintains 95% profit margins. All of Rimini's clients have licenses from Oracle, and this Court has already held that Rimini may lawfully provide support pursuant to those licenses. *Oracle USA, Inc. v. Rimini St., Inc.* 879 F.3d 948, 952–53 (9th Cir. 2018). Nevertheless, the two companies have been engaged in litigation for 14 years regarding the manner in which Rimini may provide its lawful services.

Rimini brought this declaratory judgment action to have its support processes declared non-infringing. Oracle counterclaimed, seeking more than *$1.4 billion* in damages. On the eve of a jury trial, Oracle abandoned (and thus lost) all of its damages claims. And after a bench trial, Oracle lost on three of the five product lines at issue, and obtained no relief as to a fourth. As to the remaining product line (PeopleSoft) and other claims at issue, the district court ruled in Oracle's favor on certain issues and entered a permanent injunction. These rulings and the resulting injunction contain significant legal errors.

*First*, the district court held that software code files written entirely by Rimini that contain no protected Oracle expression of *any* kind (literal or nonliteral) are infringing "derivative works" if they "only interact and [are] useable with" Oracle software. 1-ER-143–44. This definition was proposed by Oracle and adopted by

the district court even though it directly contradicts the Copyright Act, circuit precedent, and the leading treatise on copyright law—all of which recognize that a derivative work must actually incorporate protected expression from another copyrighted work. The district court's legally erroneous ruling that *entirely new* software written to *interoperate* with a copyrighted software program constitutes a derivative work—if allowed to stand—would upend the software industry. Correcting this foundational legal error requires reversal of the infringement findings and vacatur of the injunction.

*Second*, the district court erroneously struck on the pleadings Rimini's statutory defense that Rimini's clients, and Rimini acting on their behalf, may lawfully copy a computer program as "an essential step in the utilization of the computer program" or for "archival purposes." 17 U.S.C. § 117(a). Nearly all of Oracle's infringement theories hinge on the automatic, unavoidable creation of RAM copies of Oracle software that are inherent in and essential to digital computing, and that are *necessarily* created in providing software support (*e.g.*, to open, view, modify, or test any file). Congress enacted the "essential step" defense to cover the precise situation here, but the district court abrogated this legislative directive by ruling, erroneously, that Oracle's licensees are not the "owner[s] of a copy of a computer program" within the meaning of Section 117(a). This significant legal error independently warrants reversal.

*Third*, the district court misconstrued the relevant license agreements—creating nonexistent restrictions that Oracle's own license witness admitted do not exist and contradicting both the district court's own previous interpretations and this Court's binding constructions of identical language in previous litigation between the parties. These straightforward legal errors also require reversal and vacatur.

*Fourth*, the district court held Rimini liable under the Lanham Act for statements of opinion and puffery not capable of being proven true or false—for instance, that Rimini provides "more security" than Oracle and that Oracle's security services are "outdated." These errors require reversal of the Lanham Act portion of the judgment and vacatur of the corresponding portion of the injunction.

*Fifth*, even if infringement liability as to PeopleSoft were to stand, the injunction is massively overbroad, requiring the deletion of software files the district court expressly held were *non-infringing*, as well as files not even at issue or analyzed in this case. In any event, Oracle had an adequate remedy at law (damages) for *past* infringement, but abandoned that remedy on the eve of trial. Oracle cannot obtain injunctive relief simply because it chose not to pursue available legal relief. For these and several additional reasons discussed below, the Court should vacate the injunction.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 & 1332, and entered final judgment and a permanent injunction on July 24, 2023. 1-ER-2, 3–9. Rimini timely noticed its appeal on July 25, 2023. 8-ER-1587–92. On August 21, 2023, Oracle filed a Rule 59(e) motion in the district court to amend the judgment. 3-ER-313–20. The district court denied that motion on January 9, 2024, making Rimini's notice of appeal effective as of that date. 3-ER-310–12; *see* Fed. R. App. P. 4(a)(4)(B)(i). This Court has jurisdiction under 28 U.S.C. §§ 1291 & 1292(a).

# ISSUES PRESENTED

I.     Whether the district court erred in ruling that entirely original software code is an infringing "derivative work" if it "only interact[s] and [is] useable with" a copyrighted software program, even if it contains no protected expression (literal or nonliteral) from that program.

II.     Whether the district court erred in ruling that Oracle's licensees are not "owners" of a copy of a computer program under 17 U.S.C. § 117(a), precluding Rimini from invoking the Section 117(a) defense to Oracle's infringement claims.

III.     Whether the district court erred when it (a) read a non-existent "facilities" restriction into Oracle Database licenses; and (b) created in PeopleSoft licenses a non-existent distinction between manual copying (which it found permissible) and "automated" copying (which it found impermissible), and a

prohibition on the "outright" delivery of otherwise permissibly created software code.

**IV.** Whether the district court erred in holding Rimini liable under the Lanham Act based on statements of opinion and puffery.

**V.** Whether the district court erred in issuing a permanent injunction that (a) orders the permanent deletion of PeopleSoft software files *found non-infringing* (or not at issue in the case), and (b) enjoins non-infringing materials and activities solely to address *past* infringement, and in no way prohibits future infringement.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Pertinent constitutional and statutory provisions are reproduced in the addendum. Cir. R. 28-2.7.

## STATEMENT OF THE CASE

Each of Rimini's clients have purchased from Oracle, for a "substantial one-time payment," a perpetual license to use copies of Oracle's enterprise software programs to run their payroll, tax reporting, and other operations. *Oracle*, 879 F.3d at 952; *see also* 1-ER-157–58; 8-ER-1479–1540.

PeopleSoft requires regular updates to account for changes in laws and regulations to keep clients compliant with tax and other laws. 1-ER-30–31; 6-ER-1037:4–24. Oracle's PeopleSoft licensees have the basic right to copy and modify the software, and to hire (instead of Oracle) a third-party support provider (like

Rimini) to "stand in [the licensee's] shoes" under the license. 6-ER-1031:25–1032:4; 1-ER-106; *Oracle*, 879 F.3d at 952–53. As the district court here explained, that means Rimini may "perform updates or fixes to the *same extent* the Oracle [licensee] could under the pertinent license." 1-ER-158 (emphasis added). Providing that support requires accessing, updating, modifying, compiling, running, and testing the software—which in turn require Rimini to make copies of the software. *See* 1-ER-49.

## I.    *Rimini I.*

Oracle sued Rimini and its CEO (Mr. Ravin) in 2010 ("*Rimini I*"), alleging that Rimini's support processes for PeopleSoft (and several other Oracle products) infringed Oracle's copyrights. Even though all of Rimini's clients held valid licenses that authorized Rimini to service their licensed Oracle software, the district court held on summary judgment in 2014 that certain aspects of Rimini's support practices exceeded the terms of those licenses, and therefore infringed. *See Oracle*, 879 F.3d at 958–60. At trial, the jury found that Rimini's infringement was "innocent"—meaning Rimini was not aware and had no reason to believe that its conduct was unlawful. 7-ER-1424.

The district court entered a permanent injunction, which this Court subsequently reversed in part. *Oracle*, 879 F.3d at 961–62, 964. On remand, the district court re-entered a revised injunction, which Rimini again appealed. This

Court again reversed in part, holding the injunction was overbroad in certain respects, including in imposing a facilities restriction for licenses that do not contain such a restriction. *Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710–11 (9th Cir. 2019).[1]

## II.    *Rimini II.*

Consistent with the district court's 2014 summary judgment rulings, Rimini fundamentally revised its support processes, spending millions of dollars to migrate certain PeopleSoft environments off of Rimini's computer systems (*Oracle*, 81 F.4th at 849; 6-ER-1154:20–1155:17, 1157:2–9, 1163:16–1168:11, 1043:2–1044:10, 973:22–974:7, 977:1–978:11), and to develop its own software tools to automate aspects of its new support process (1-ER-52; 6-ER-1164:1–11, 1154:15–19, 932:18–15; 8-ER-1462–78).    Rimini then filed this lawsuit ("*Rimini II*"), seeking a declaratory judgment that its revised processes do not infringe Oracle's copyrights as to Oracle's PeopleSoft, E-Business Suite (EBS), J.D. Edwards (JDE), Siebel, and Database product lines.    Oracle responded by filing counterclaims seeking $1.4 billion in damages and equitable relief across the same five product lines. *See* 7-ER-1307–08.

---

[1] This Court recently affirmed in part, reversed in part, and vacated in part contempt findings against Rimini related to that injunction. *See Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843 (9th Cir. 2023).

In July 2015, the district court struck from the pleadings Rimini's Section 117(a) defense to Oracle's claims of infringement. The court held that Section 117(a) categorically "does not apply to the present action because Oracle's customers only license, rather than buy, Oracle's copyrighted software," and so cannot be considered "'owners' of the software within the meaning of Section [117(a)] as a matter of law." 2-ER-305.

After eight years of litigation, on the eve of a jury trial, Oracle abandoned all of its claims for monetary relief, and the case proceeded to a bench trial on declaratory and equitable relief. 7-ER-1190–92, 1178–83. At the close of the trial, the court ordered the parties to simultaneously file updated proposed findings of fact and conclusions of law to conform to the evidence at trial. 6-ER-913–16. When the parties made their post-trial filings and Rimini saw Oracle's proposed injunction for the first time, Rimini requested a hearing and sought leave to object (lodging detailed objections), but the district court denied Rimini's requests. 3-ER-376–417.

On July 24, 2023, the district court entered judgment and issued a permanent injunction. 1-ER-2–206. The district court rejected Oracle's claims of infringement as to Rimini's support of Oracle's EBS, JDE, and Siebel product lines. *See* 1-ER-10. As relevant to this appeal, however, the court ruled that Rimini infringed certain PeopleSoft and Database copyrights, and violated the Lanham Act.

*Infringement.* The district court held that scores of updates and files created by Rimini for PeopleSoft—even 100% Rimini-written files that, standing alone, contain no protected Oracle expression of any kind—are "derivative works" because (regardless of content) they "only interact[] and [are] useable with" PeopleSoft. 1-ER-143–44; *see also* 1-ER-155–56 (holding that *all* "updates to PeopleSoft that Rimini developed during the [*Rimini*] *II* period are infringing derivative works" under this standard). These include Rimini's own patented automated tools, because "they were developed in [Rimini's] customers' PeopleSoft software environments and rely on the software for their operation." 1-ER-160. The court ordered Rimini to "immediately and permanently delete all copies" of these files, updates, and tools. 1-ER-4–5.

The court separately held that Rimini infringed Oracle's copyrights when it created fifteen "rewritten" versions of clients' fully licensed Oracle files (to improve their functionality) that contained portions of Oracle code and (all but one of which) had filenames beginning with "RSI." 1-ER-152–53. The court ordered Rimini to destroy not only those "rewrite" files, but also *all* files whose names begin with "RS" or "RSI" *regardless of their content*, so long as they were sent to clients using Rimini's "TransferFiles" tool—a basic software tool used to transfer electronic files from one location to another (much like common FTP services or even email). 1-ER-4–5. This means that Rimini must destroy non-infringing files created after the

9

close of discovery for which no evidence was presented—merely because they use this standard Rimini Street ("RS" or "RSI") naming convention and were sent to clients.

Finally, the court held that Rimini infringed Oracle's copyrights in 2014 when it moved some clients' PeopleSoft environments from Rimini's systems back to the clients' systems, consistent with the court's 2014 summary judgment ruling in *Rimini I* that the clients' licenses with Oracle required the clients' PeopleSoft environments to be stored on the clients' systems. The court held that Rimini should have "explore[d] alternative ways to support its clients affected by the migration in a non-infringing manner," despite unrebutted evidence about "the purported technical infeasibility of noninfringing approaches." 1-ER-172. The court ordered Rimini to go into its clients' systems and permanently delete these environments. *See* 1-ER-4–5.

**Lanham Act.** The court held that 15 statements Oracle claimed were made by Rimini "to customers and prospective customers" were "literally false." 1-ER-178–82. The court enjoined Rimini from making any of those statements "or any substantially similar statements," and required Rimini to post on its website for five years a "corrective press release" stating that Rimini "made" "false and misleading statements," listing each of the fifteen statements, and prohibiting any further speech by Rimini providing context. 1-ER-6–9.

Rimini appealed on July 25, 2023, and moved for an emergency stay of the injunction with the district court on July 28, 2023. 8-ER-1587–92; 3-ER-332–75. The court denied that motion on August 15, 2023, but issued a temporary stay while this Court resolves Rimini's motion for a full stay pending appeal. 3-ER-321–31. The temporary stay remains in effect. ECF No. 12.

## SUMMARY OF THE ARGUMENT

**I.** The district court's infringement findings and the ensuing injunction were centered on the extraordinary and incorrect holding that Rimini's own software is an infringing derivative work—even when found to contain *no* protected Oracle expression (literal or nonliteral) of *any kind*—simply because Rimini designed it only to interact and be useable with Oracle software. This incorrect and expansive definition of derivative works threatens the entire industry for software designed to work with other software—in today's age, virtually all software. It directly contradicts **(A)** the text of the Copyright Act and precedent from a half-dozen federal courts of appeals (including this one)—which explicitly require derivative works to *actually incorporate protected expression* from a copyrighted work, not just work with it—as well as **(B)** the entire purpose of copyright law. Moreover, **(C)** the district court wholly ignored that Oracle's PeopleSoft licenses explicitly allow Rimini's clients (and Rimini acting in their stead) to create and use derivative works, and that in many of those licenses Oracle explicitly disclaims any intellectual

11

property right in any component of the derivative work that was developed by the clients (and Rimini acting in their stead).

**II.**   Oracle's copyright claims are foreclosed by 17 U.S.C. § 117(a), which provides that copies made as an essential step to providing software support or for archival purposes are not infringing.  Purporting to rely on this Court's decision in *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010), and in direct conflict with the Second Circuit's decision in *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005), the district court dismissed that defense at the pleadings stage on the ground that a licensee of a software program is not the "owner of a copy of a computer program" for purposes of Section 117(a).  But **(A)** Section 117(a) was designed for the precise issues raised in this case, and the district court's position is incompatible with the plain text of the Copyright Act and this Court's precedents; and **(B)** the district court's error severely prejudiced Rimini by precluding an express defense to Oracle's infringement claims.

**III.**   The district court erred in construing the applicable Database and PeopleSoft licenses.  **(A)** As to Database, the court held that Rimini impermissibly stored its clients' Database software on Rimini's systems—but there is no language in the Database licenses prohibiting Rimini from doing so.  This is an error this Court has previously corrected in litigation between the same parties and will now have to correct again.  **(B)** As to PeopleSoft, the court contradicted this Court's prior rulings

on what it means for copies of PeopleSoft software to be made "solely for [the] internal data processing operations" of a licensee, ruling that **(1)** copies generated manually by a Rimini engineer conform to that language, while the same copies generated automatically by Rimini's proprietary tools do not; and **(2)** Rimini may not deliver an update "outright" to subsequent clients after permissibly developing it for one client. None of these holdings finds support in the actual license language, and each of them should be reversed.

**IV.** The district court erred in holding Rimini liable and enjoining it under the Lanham Act. The court held plain statements of opinion and puffery to be "literally false," contrary to this Court's precedents.

**V.** Even if the district court's liability findings are affirmed, it committed multiple legal errors and abuses of discretion in issuing the injunction that warrant, at minimum, vacatur. **(A)** The injunction is plainly overbroad, ordering the deletion of scores of files explicitly found *non-infringing*, as well as files *not at issue in this case* and for which there is no evidence in the record. **(B)** And the court erred in enjoining non-infringing materials and activities solely to address *past* infringement for which Oracle had (and abandoned) an adequate remedy at law (monetary damages).

## STANDARDS OF REVIEW

The Court reviews de novo "questions of statutory interpretation" (*Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021)), "dismissal for failure to state a claim" (*ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)), the interpretation of copyright licensing agreements, the "grant of summary judgment," and "conclusions of law after a bench trial" (*MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 937–38, 955 (9th Cir. 2010)).  With respect to injunctions, the Court reviews "the legal conclusions de novo, the factual findings for clear error, and the decision to grant a permanent injunction, as well as its scope, for an abuse of discretion."  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013).  "[A]n error of law" is always an abuse of discretion.  *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012).

## ARGUMENT

This Court has heard several appeals in the ongoing litigation between Rimini and Oracle regarding *how* Rimini may provide support for licensees of Oracle software in lawful competition with Oracle's direct maintenance services.  *See* 879 F.3d 948 (9th Cir. 2018); 783 F. App'x 707 (9th Cir. 2019); 81 F.4th 843 (9th Cir. 2023).  In each of those appeals, the Court has reversed consequential portions of the district court's rulings.  Once again, the district court has committed significant legal errors that warrant correction by this Court.

## I. The District Court Applied a Legally Erroneous Definition of "Derivative Works."

The central error in the district court's decision and injunction was its ruling that 100% Rimini-written files that contain *no protected Oracle expression* (literal or nonliteral), including Rimini's own patented software tools and all Rimini-written "updates to PeopleSoft that Rimini developed during the *[Rimini] II* period[,] are infringing derivative works." 1-ER-155–56. The district court held that such works are derivative works—*irrespective* of their content—simply because they "only interact[] and [are] useable with" Oracle's software. 1-ER-143–44, 52–53, 155–56, 160. That ruling is legally erroneous, and while the district court recognized in 2021 that it "may be" overturned on appeal, it declined to certify it for interlocutory appeal, and instead allowed it to dictate multiple significant rulings in the case (including the judgment and injunction). 7-ER-1259. The error is prejudicial and requires reversal.[2]

---

[2] The evidence at trial showed countless instances of Rimini files that contained no protected Oracle expression whatsoever (literal or non-literal). *See*, *e.g.*, 6-ER-1072:16–1073:20, 938:12–18, 945:15–23, 948:15–23, 949:20–952:14. That is unsurprising, given that Oracle's expert admitted she did not analyze their contents and instead labeled them infringing derivative works "*regardless*" of what they contained. 6-ER-1122:9–1123:24 (emphasis added).

**A.**   **Derivative Works Must Actually Incorporate Protected Expression.**

**1.**   Analysis of the Copyright Act, like any other statute, begins with "[t]he statutory text" (*Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 876 (2019)), considering the "overall context of the Copyright Act," "interrelationship of [its] various provisions" (*MDY*, 629 F.3d at 943), and "relevant canon[s] of statutory interpretation" (*Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013)). These traditional tools of construction establish that derivative works must *actually incorporate* protected expression in some form (literal or non-literal) from the underlying copyrighted work. *See Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 967 (9th Cir. 1992), *as amended* (Aug. 5, 1992). Indeed, "[t]he leading treatise on copyright law" (*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)) recognizes that "a derivative work … *must incorporate* that which itself is the subject of copyright. Such a condition … is necessary if the concept of derivative work is to be meaningful and useful." 1 Melvin B. Nimmer & David Nimmer, *Nimmer on Copyright* § 3.01 (2021) [hereinafter *Nimmer on Copyright*] (emphasis added).

Section 101 of the Copyright Act defines "derivative works" as:

> a work based upon one or more preexisting works, *such as* a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.

17 U.S.C. § 101 (emphasis added). Key to that definition is the textual limitation "such as," which functions to "indicat[e] that" the "other matters" that are "includable" are "*of the same kind*" as the examples listed. *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 243 (5th Cir. 2022) (emphasis added); *id.* (term "natural disaster" "*such as*" "floods, earthquakes, and droughts" was limited to disasters of the same kind and did not include the COVID-19 pandemic (emphasis added)). As this Court has held when analyzing this text, "*all*" examples of derivative works provided here "*physically incorporate* the underlying work or works." *Galoob*, 964 F.2d at 967 (emphases added).

That straightforward textual reading is confirmed by the "familiar interpretative canon *noscitur a sociis*, a word is known by the company it keeps[,]" a canon particularly important "to avoid the giving of unintended breadth to the Acts of Congress." *Dubin v. United States*, 143 S. Ct. 1557, 1569 (2023) (quotation marks omitted). Courts have long recognized the inherent danger of adopting a position like Oracle's, which myopically focuses on the term "based upon," shorn of its broader context. That phrase in isolation would be "hopelessly overbroad," "for every book in literature, science and art, *borrows and must necessarily borrow*, and use much which was well known and used before" and in at least that sense could be "based upon" preexisting copyrighted works. *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998) (quotation marks omitted) (emphasis added). Such

a reading would lead to an "absurd result" (*Kirtsaeng*, 568 U.S. at 544), because it would mean "all works may be considered derivative works." 1 *Nimmer on Copyright* § 3.01 (rejecting such an interpretation). But that is not and has never been the law. *See Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 538 (S.D.N.Y. 2008) ("A work is not derivative … simply because it is 'based upon' the preexisting works." (quoting *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 521 (7th Cir. 2002)).

This common-sense reading of the statute's text is further confirmed by a consideration of the "interrelationship of the various provisions" of the Copyright Act (*MDY*, 629 F.3d at 944), specifically, 17 U.S.C. § 103, which details the scope of copyright protection in derivative works and presupposes actual incorporation. Subsection (a), for instance, states that "protection for a work *employing preexisting material* in which a copyright subsists does not extend to any *part of the work* in which *such material has been used* unlawfully." (Emphases added). Similarly, subsection (b) provides that the copyright in a "derivative work extends only to the *material contributed by the author* of such work, *as distinguished from the preexisting material employed in the work*." (Emphases added). The statute thus sharply distinguishes between "parts" of a derivative work—the part which is the original and the part which is contributed by a subsequent author. Without actual incorporation, Section 103 makes no sense.

The Copyright Act requires actual incorporation of protected expression of some copyrighted work (whether in literal or non-literal form). Not a word of the Copyright Act intimates otherwise, and "[t]he Act's legislative history" also "indicates that 'the infringing work *must* incorporate a portion of the copyrighted work in some form'" to be derivative. *Galoob*, 964 F.2d at 967 (emphasis added) (quoting 1976 U.S. Code Cong. & Admin. News 5659, 5675).

**2.** A long line of cases from this Court and five other circuits uniformly confirms that a work is not "derivative" of a copyrighted work if it does not actually incorporate either literal or non-literal protected expression of the original work.

This Court has been clear: To be a derivative work, a work *must* "substantially incorporate protected material from the preexisting work." *Micro Star*, 154 F.3d at 1110. That means actual incorporation of, not just dependency on, protected material. *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1079 (9th Cir. 2000). Even when a work is "useless by itself" and can be operated only in conjunction with a copyrighted work, this Court has held it is not derivative of the copyrighted work unless it "physically incorporate[s] a portion of [the] copyrighted work." *Galoob*, 964 F.2d at 969.

That is not to say that software is derivative only if it substantially incorporates protected *code* or other *verbatim aspects* of a preexisting work. Digital works can contain protected and expressive *non*-literal elements aside from their

coding. For example, in *Micro Star*, this Court deemed Micro Star's computer game files to be derivative works notwithstanding that those files did not incorporate any code from the computer game Duke Nukem 3D. The files were derivative because they incorporated *other* protected material from Duke Nukem 3D, such as the Duke Nukem "story itself," including its "plot, theme, dialogue, mood, setting, characters, etc." 154 F.3d at 1112. In those circumstances, the fact that Micro Star (as it argued) did not incorporate any of the *verbatim code* used in Duke Nukem 3D was irrelevant; it was the incorporation of *other* expressive, creative elements of the Duke Nukem story that rendered Micro Star's game files derivative works. *Id.*

But *Micro Star* does not support the view advanced by Oracle and adopted by the district court here—that Rimini files incorporating *no protected Oracle expression whatsoever* (literal or nonliteral) are derivative works simply because they "only interact[] and [are] useable with" Oracle software. 1-ER-143–44, 52–53, 155–56, 160. While *Micro Star* noted in a footnote that the game files at issue could "only be used with [Duke Nukem 3D]," that same footnote explains that the operating environment was relevant only because of how it was used to "tell[] a [Duke Nukem] story," itself protected expression adopted into Micro Star's game files. 154 F.3d at 1112 n.5. If those same game files could be used to tell *different* stories about *different* characters unconnected to Duke Nukem, they would not infringe—even if they ran dependently on the Duke Nukem game engine. *Id.*; *see*

*also* Dennis S. Karjala, *Harry Potter, Tanya Grotter, and the Copyright Derivative Work*, 38 Ariz. St. L. J. 17, 28–29 & n.57 (2006).

This Court's decision in *Galoob* (a decision the district court never cited or addressed despite Rimini's repeated invocation of and reliance on it) is squarely on point, and explicitly forecloses the notion that software can be a derivative work based solely on interoperability—*i.e.*, because it "only interacts and is useable with" (1-ER-143–44) a copyrighted work. In that case, Nintendo sued the defendant for creating the "Game Genie"—a device inserted between the game cartridge and computer console that "allow[ed] the player to alter up to three features of a Nintendo game." *Galoob*, 964 F.2d at 967. For example, if a player wanted to arm Super Mario with five lives instead of three, she could enter a "code[] provided by the Game Genie Programming Manual" on her control pad; the Genie would then intercept data signals between the cartridge and the computer and replace them with signals instructing the computer to grant extra lives. *Id.* Nintendo argued that the Game Genie was itself a derivative work and created derivative works each time it was used. *Id.*

This Court squarely rejected Nintendo's argument: Even though the Game Genie was "*useless by itself*" and could be operated *only* in conjunction with Nintendo's products, the Game Genie was not infringing because it did not "physically incorporate a portion of [the] copyrighted work." *Galoob*, 964 F.2d at

969 (emphasis added). For a work to be derivative, there must be more: actual incorporation of, not just dependency on, protected material, either literal or non-literal. That holding is dispositive here.

This Court has repeatedly reaffirmed its holding from *Galoob*. For example, in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), the Court held that a computer owner does not display a copy of an image when it communicates only the HTML address. The Court explained that frequently "the various rights protected in section 106 … overlap[]," citing *Galoob* as a prime example: "[In *Galoob*] [w]e held that a copyright holder's right to create derivative works is not infringed unless the alleged derivative work 'incorporate[s] a protected work in some concrete or permanent form.'" *Id.* at 1161. Similarly, in *Ets-Hokin*, this Court explained that "a derivative work, unlike a compilation, *must incorporate that which itself is the subject of copyright.*" 225 F.3d at 1079 (emphasis added) (quoting 1 *Nimmer on Copyright*, § 3.01, at 3–3 n.10 (1999)).

At least five other circuits also have held that a derivative work must actually incorporate protected expression of the original work. *See Brownstein v. Lindsay*, 742 F.3d 55, 68 (3d Cir. 2014) (a derivative work "incorporates the original work"); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988) ("To constitute a derivative work, the infringing work must incorporate in some form a portion of the copyrighted work" (quotation marks omitted)); *Hiller, LLC v. Success*

*Grp. Int'l Learning All., LLC*, 976 F.3d 620, 628 n.5 (6th Cir. 2020) ("[A] derivative work … must incorporate that which itself is the subject of copyright." (quotation marks omitted)); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010) ("Under 17 U.S.C. § 101, a derivative work must incorporate a substantial element of a preexisting work of authorship[.]" (quotation marks omitted)); *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 829 (Fed. Cir. 2020) ("A derivative work must incorporate some or all of a preexisting work[.]" (quotation marks omitted)).

The district court's definition of derivative works contravenes every pertinent authority. Affirmance would create both an intra- and inter-circuit conflict, supplanting the long and unbroken line of authority holding that a derivative work "*must incorporate* that which itself is the subject of copyright." 1 *Nimmer on Copyright* § 3.01 (emphasis added). The district court's clear, plain, and egregious error—invited by Oracle and its expert—requires immediate correction.

### B. The District Court's Erroneous Definition of Derivative Works Would Stifle Competition and Creativity.

The district court's erroneous definition of derivative works threatens to upend the software industry, contravening the law of derivative works generally and the overarching purpose of the Copyright Clause of the Constitution.

The Copyright Clause was designed not "to provide a special private benefit" to Oracle, but to promote the common good by ensuring "public access" to copyrighted works, thus spurring further innovation. *Sony Corp. of Am. v. Universal*

*City Studios, Inc.*, 464 U.S. 417, 429 (1984); U.S. Const. art. I, § 8, cl. 8.  The proper resolution of whether original software that incorporates no protected expression from a copyrighted work, but that was developed with and designed to work with a copyrighted work, can be a derivative work unquestionably has far-reaching implications for copyright law.

This Court recognized as much in *Galoob* itself, where it held that if all such component works were inescapably "derivative," the derivative-works doctrine would jeopardize *nearly all software products*—including those as basic as "spell-checkers that operate within existing word processors."  964 F.2d at 969.  Such a reading of the Copyright Act "would yield an absurd result in the context of development of computer programs and applications[:] No one using a particular programming tool, environment, platform or programming language would *ever* be able to copyright its work as it would always be considered a derivative work of the computer program or software used to create the works."  *Drives & Controls Servs., Inc. v. Elec. Tech. Serv. & Repair, Inc.*, 2010 WL 11597884, at *10 (D. Wy. Feb. 12, 2010) (emphasis added).  And it would "chill innovation" in technological fields, including software development, which "often advance[] by improvement rather than replacement"; and would "fail to protect society's competing interest in the free flow of ideas, information, and commerce"—precisely the opposite of what the

Copyright Act was enacted to accomplish. *Galoob*, 964 F.2d at 969 (quotation marks omitted).

To be abundantly clear—Rimini's argument is *not*, and has never been, that the resulting modified software environment in the client's systems that contains *Oracle's* program with a *Rimini-written* update embedded in it is not a derivative work. There is no need for such an argument because, assuming those *are* derivative works, they are squarely *licensed*, as the district court itself acknowledged on summary judgment. 2-ER-258–60. Rather, the central flaw of Oracle's position, adopted by the district court, is that all of Rimini's updates, files, code, tools, and other 100% Rimini work product, *when sitting alone* on either Rimini's systems or its clients' systems and *not* running with Oracle's software, are nonetheless derivative works, despite containing *no protected Oracle expression*.

Such files and other Rimini work product are not derivative works. The district court's contrary ruling warrants reversal of the judgment and vacatur of the injunction, which are premised on the court's erroneous derivative works rulings. *See* 1-ER-4–5.

**C.    The District Court Also Erred by Ignoring PeopleSoft Licenses That Permit the Creation of Derivative Works.**

All of the more than 375 PeopleSoft license agreements at issue in this case explicitly provide that the licensee may create and use derivative works. *See*, *e.g.*, 4-ER-620, 624, 626–27 (nearly two hundred PeopleSoft licenses providing that the

Licensee may "modify or merge the Software with other software"); 4-ER-622, 626 (sixty PeopleSoft licenses providing that a Licensee can "modify or merge the Software with other software, and use such modified or merged software"); 4-ER-625, 629–30 (similar for remaining PeopleSoft licenses). Thus, even if the Rimini-written PeopleSoft updates were derivative works under the proper definition (they are not), they would be licensed.

Many of Oracle's license agreements explicitly *disclaim* that Oracle even has an intellectual property right in any component of a derivative work that was developed by the licensee (or its agent). *See*, *e.g.*, 9-ER-1989 ¶ 4.1 ("If Licensee creates a Software modification using PeopleTools, Licensee shall only have title in such modification that remains after PeopleTools has been separated from the modification."), 1974 (same), 1982 (same); 10-ER-1996 (same), 2000 (same), 2014 (same), 2006 (similar); 9-ER-1935 (similar for JDE); 10-ER-2039 ¶ 4.1 (licensee is under "no obligation" to disclose modifications to PeopleSoft, but if licensee does disclose a modification, the parties will enter into negotiations "to determined [sic] the terms of an agreement that would grant PeopleSoft full rights title and interest to such Substantive Modification and compensate Licensee for its development efforts related to such Substantive Modification"). Oracle cannot claim copyright protection over a modification that is free of any Oracle expression where its license agreements expressly disclaim intellectual property rights over such modifications.

Although the district court found that certain PeopleSoft legacy licenses prohibit Rimini from providing any "modifications" to the software to clients through any means other than a long-since-defunct "PeopleSoft forum" (1-ER-67–69; 9-ER-1796), this provision does not exist in *all* PeopleSoft licenses. And in any event, *even if* it violated *some* PeopleSoft license agreements for Rimini to distribute these files through a means other than the PeopleSoft forum, the PeopleSoft forum provision is not a "condition" of the license grant, but a mere "covenant" under the license, "the breach of which is actionable only under contract law." *MDY*, 629 F.3d at 939. Breach of this covenant cannot conceivably "implicat[e] one of the licensor's exclusive statutory rights" (*id.* at 940) because the files are either not derivative works at all; or if they are, they are licensed, Oracle has disclaimed ownership in the Rimini-created component of them, and Oracle affirmatively waived all breach of contract claims against Rimini in this case. *See* 7-ER-1185–86 (stipulating to dismiss such claims with prejudice).

The district court's holding that all Rimini updates were infringing derivative works is thus contrary to the plain terms of the PeopleSoft license agreements.

## II. The District Court Erred by Striking Rimini's Section 117(a) Defense.

Congress has expressly provided that making copies of computer programs for maintenance and support purposes is not an infringing act. 17 U.S.C. § 117(a). That provision is tailor-made for the circumstances presented here and should have

precluded Oracle's copyright claims. Rimini made that point at the outset of this litigation (7-ER-1458), but the district court ruled—on the pleadings, as a matter of law—that Rimini was not entitled to rely on Section 117(a). 2-ER-304–06. That was pure legal error, the correction of which requires reversal.

Congress enacted Section 117(a) of the Copyright Act in response to the reality that it is impossible to use or service computer software without making copies of the software. *See*, *e.g.*, *Vault*, 847 F.2d at 261. The resulting legislation provides that copies of software necessarily made for those purposes are not infringing. *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1312 (Fed. Cir. 2005) (Section 117(a) enacted "to protect the class of companies that fix and maintain computer systems").

Section 117(a) protects the "owner of a copy of a computer program" against infringement liability for "mak[ing] or authoriz[ing] the making of another copy" of that program for certain specified purposes. As explained further below, there is no dispute in this case that virtually all of the copies made by Rimini on behalf of its clients were made for those purposes. The *only* question—the one that the district court answered erroneously—is whether Rimini's clients (all of which are Oracle's licensees) are the "owner[s] of a copy of a computer program" within the meaning of Section 117(a). They are.

### A. Oracle's Licensees Are the Owners of a Copy of a Computer Program.

The proper test for determining whether a party is an "owner" under Section 117(a) asks whether the party owns a copy of the software, not whether it owns the *copyright*. *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1183 (9th Cir. 2011). This Court adopted that test in *UMG*, taking it from the Second Circuit's decision in *Krause*, 402 F.3d at 124. Under this standard, licensees of software (and by extension their agents) can be the "owner of a copy of a computer program" for purposes of Section 117(a) if there are "sufficient incidents of ownership" over the copy of the software. *UMG*, 628 F.3d at 1183.

But relying solely on this Court's pre-*UMG* decision in *Vernor*, 621 F.3d 1102, the district court ruled as a matter of law that Rimini cannot invoke Section 117(a) because Rimini's clients only *license*, and do not *own*, the software. The district court misconstrued *Vernor* and Section 117(a) to categorically bar software licensees (and thus their agents) from invoking this defense. That was error. This case therefore presents this Court with a stark choice: Endorse the district court's illogical extension of *Vernor* and create a square conflict with the Second Circuit, or follow *UMG*, *Krause*, and the plain text of the Copyright Act, and reverse the district court's dismissal of Rimini's Section 117(a) defense.

**1.** The district court's reading of *Vernor* contravenes the plain text of the Copyright Act.

In *Vernor*, CTA licensed software from Autodesk, Inc., with the license agreement providing that Autodesk reserved title to the CD copies of the software provided to CTA. 621 F.3d at 1105. Nonetheless, CTA subsequently sold the CDs to Timothy Vernor, who in turn sold them on eBay. Autodesk advised Vernor that this resale was infringement. Vernor brought a declaratory judgment action invoking the "first sale" doctrine under 17 U.S.C. § 109 and the essential step defense under Section 117(a), both of which apply to the "owner" of "a copy" of the software. *Id.* at 1111. This Court held that CTA was not an owner of a copy of Autodesk's software, and that Vernor and his customers therefore were never owners of a copy of the software either. *Id.* at 1111–13. The Court relied on the fact that in its license agreement with CTA, "Autodesk retained title to the software and imposed significant transfer restrictions: it stated that the license is nontransferable, the software could not be transferred or leased without Autodesk's written consent, and the software could not be transferred outside the Western Hemisphere," and even provided grounds for "termination of the license." *Id.* at 1111–12.

Purporting to rely on *Vernor*, the district court here held that Section 117(a) categorically "does not apply to the present action because Oracle's customers only license, rather than buy, Oracle's copyrighted software," and so cannot be considered "'owners' of the software within the meaning of Section [117(a)] as a matter of law." 2-ER-305. That was the *full extent* of the district court's analysis of

the question. But this reading plainly confuses being the owner "of a *copy* of a computer program" (17 U.S.C. § 117(a)(1) (emphasis added)), with being an "'owner[]' *of the software*." 2-ER-305 (emphasis added). The two are manifestly different, as both the text of the Copyright Act and the leading treatise on copyright law recognize. *See* 17 U.S.C. § 202 ("Ownership of a copyright, … is distinct from ownership" of the medium "in which the work is embodied."); 2 *Nimmer on Copyright* § 8.08[B][1][c][i] ("The owner of that *copy*, it bears emphasis, is distinct from the *copyright* owner of the software itself.").

There would be no need for an essential step defense if it could *only* be invoked by those who *own the software at issue*. *See* 2 *Nimmer on Copyright* § 8.08[B][1][c][i] ("Plainly, the copyright proprietor itself needs no exemption in order to engage in limitless acts of reproduction."). The district court's reading of Section 117(a) guts this express statutory defense, contrary to the established principle of interpretation to "mak[e] every effort not to interpret" a statute "in a manner that renders" it "meaningless." *Padash v. I.N.S.*, 358 F.3d 1161, 1170–71 (9th Cir. 2004).

**2.** The district court's position is not only wrong, but it also conflicts with the Second Circuit's approach—an approach this Court adopted in *UMG*.

The Second Circuit's approach in *Krause* is faithful to the text of the Copyright Act, which makes the essential step defense available to all "owner[s] of

31

a copy of a computer program"—not only owners of the computer program itself. 17 U.S.C. § 117(a).  In *Krause*, a software developer sued his former employer for modifying the software program he developed.  402 F.3d at 120–21.  When the former employer invoked the essential step defense under Section 117, the software developer argued that his employer "never owned the program copies" "but rather possessed the copies as a licensee."  *Id.* at 122.  The former employer argued that even as a licensee, it *owned the copies* of the software because it paid a "substantial sum" "to possess and use them permanently."  *Id.*

The Second Circuit agreed with the former employer.  It emphasized at the outset of its analysis—directly contrary to the district court's here—that "[o]wnership of a copy is something distinct from copyright ownership."  402 F.3d at 122.  The Second Circuit rejected the notion that "Congress's substitution of the word 'owner'" for the phrase "'rightful possessor'" (used in a previous version of the bill) showed that "Congress intended to restrict the benefit of the statute to *title* owners."  *Id.* at 123 (emphasis added).  Rather, it was more likely that Congress redlined "rightful possessor" because the term was "quite broad," whereby "the authority granted by the statute would benefit a messenger delivering a program, a bailee, or countless others temporarily in lawful possession of a copy."  *Id.*

There was good reason, the Second Circuit explained, to reject reading Section 117(a) as requiring "formal title in a program copy."  402 F.3d at 123.  *First*,

"whether a party possesses formal title will frequently be a matter of state law," so reading such a requirement into Section 117(a) would undermine the Copyright Act's "express objective of creating national, uniform copyright law by broadly preempting state statutory and common-law copyright regulation." *Krause*, 402 F.3d at 123 (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989)). "The same transaction might be deemed a sale under one state's law and a lease under another's." *Id.* Accordingly, "two software users, engaged in substantively identical transactions might find that one is liable for copyright infringement while the other is protected by [Section] 117(a), depending solely on the state in which the conduct occurred." *Id.*

*Second*, the Second Circuit explained it would be "anomalous for a user whose degree of ownership of a copy is so complete that he may lawfully use it and keep it forever, or if so disposed, throw it in the trash, to be nonetheless unauthorized to fix it when it develops a bug, or to make an archival copy as backup security." 402 F.3d at 123. Accordingly, the court held "that formal title in a program copy is not an absolute prerequisite to qualifying for [Section] 117(a)'s affirmative defense." *Id.* at 124. Instead, a court should consider certain "incidents of ownership" to determine whether a licensee of software "owned" a copy of the software: (i) whether the licensee paid "substantial consideration" for the copy; (ii) whether the copy was "customized" to the user's "operations"; (iii) whether the copy was

"stored" by the user rather than the copyrighted holder; and (iv) whether the licensing agreement granted the licensee a perpetual (rather than temporary) right of use. *Id.* at 124–25.

This Court explicitly adopted and applied the "incidents of ownership" test in *UMG*, holding that the "recipients" of certain "promotional CDs" did not have "sufficient incidents of ownership" over those "promotional copies 'to sensibly be considered the owner of the cop[ies].'" 628 F.3d at 1183 (quoting *Krause*, 402 F.3d at 124). Importantly, the Court did this *after* a lengthy discussion of *Vernor*, even noting that "software users who order and pay to acquire copies" of software "are in a very different position" than the recipient of the promotional CDs at issue in *UMG*. *Id.*

**3.** The district court's reading of Section 117(a) is wrong, ignores *UMG*, and, if accepted, would put this Court into open conflict with the Second Circuit on an exceedingly important issue of copyright law. Although Rimini showed that the "incidents of ownership" establish the applicability of the defense here (*see, e.g.*, 7-ER-1441–43, 1380–83), the district court struck the defense as a matter of law because "Oracle's customers only license" "Oracle's copyrighted software," and so "are not 'owners' of the software" (2-ER-305).

A straightforward application of the incidents of ownership test here demonstrates that Rimini's clients own the copy of the software they license from

Oracle. Oracle's customers (Rimini's clients) pay "substantial consideration" for the copy of enterprise software they receive from Oracle (*Krause*, 402 F.3d at 124). *See*, *e.g.*, *Oracle*, 879 F.3d at 952; 6-ER-998:3–7 ($5 million), 919:14–17 ($1 to $2 million). And the copy of the software each licensee owns was "customized to" the user's "operations" (*Krause*, 402 F.3d at 124–25)—that is the whole point of enterprise software. *See Rimini St., Inc. v. Oracle Int'l Corp.*, 2020 WL 5531493, at *1 (D. Nev. Sept. 14, 2020) (key feature "of enterprise software is its customizability; the software can be modified to fit the specific needs of the organization licensing it"); 6-ER-1175. Those copies are stored on servers owned or run by the licensee—not Oracle. *See Krause*, 402 F.3d at 124–25; 6-ER-1163:1–15, 1164:1–9, 1092:23–1093:14, 1040:22–1041:11. And the licensees have a perpetual right to use, or even "discard or destroy the copies." *Krause*, 402 F.3d at 124; *see* 9-ER-1888; 10-ER-2083, 2056, 2057; 6-ER-1076:9–1077:2, 1080:12–25, 1083:9–18.

To be sure, Oracle retains ownership of *its copyrights* when it licenses its software; but its licensees "own" their *copies* of the computer programs within the meaning of Section 117(a).

## B. Section 117(a) Protects Rimini's Conduct.

Correction of the district court's erroneous conclusion that Rimini's clients do not "own" their copies of Oracle software requires reversal because Section 117(a)

authorizes the precise sort of copying that Rimini necessarily engages in to provide software support to its clients.  Outright reversal is therefore appropriate.  At the very least, Rimini was entitled to develop and present its Section 117(a) defense, and the district court's erroneous striking of the defense on the pleadings warrants vacatur and remand of the infringement findings and corresponding injunctive relief.

Rimini's clients authorized Rimini to, on their behalf, make "cop[ies]" of and "adaptation[s]" to the "computer program."  17 U.S.C. § 117(a)(1).  As Rimini's standard agreements with its clients provide—the client hires and "authorize[s]" Rimini to, among other things, "provide fixes" to "source code" and "Client-Made Customized Code," as well as provide "tax, legal, and regulatory updates." *E.g.*, 9-ER-1911–12; *see also* 9-ER-1914.  *All* of these authorized activities necessarily result in the creation of copies of the software program.  *See*, *e.g.*, 6-ER-1126:18–1127:10, 1070:21–1071:11, 984:8–20, 930:4–931:18.

Moreover, virtually all of the copies held infringing here were either an "essential step" to running the software program in conjunction with a machine or for archival purposes.  Copies held to be essential steps include those made for:

- "correcting programming errors or 'bugs,' which interfered with the proper functioning of the programs" (*Krause*, 402 F.3d at 125);
- "changing the source code to add new clients, insert changed client addresses, and perform other routine tasks necessary to keep the programs up-to-date and to maintain their usefulness" (*id.*);
- "incorporating … programs into the … system" (*id.*);

36

- "adding capabilities … which made [the user's] copy of the programs more responsive to the [user's] needs" (*id.*);

- modifications "to keep [programs] up-to-date and to ensure their compatibility" (*id.*);

- "debugging and routine modifications … to support existing functions, or support changes in business needs" (*Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 374 (E.D. Va. 2011)); and

- the creation of "RAM copies" upon the running of a software program (*Princeton Payment Sols., LLC v. ACI Worldwide, Inc.*, 2014 WL 4104170, at *7 (E.D. Va. Aug. 15, 2014); *ZilYen, Inc. v. Rubber Mfrs. Ass'n*, 935 F. Supp. 2d 211, 221 (D.D.C. 2013)).

The case law reads as a near-exact description of Rimini's business, and there is no dispute that the vast majority of copies held infringing in this case, particularly RAM copies, were an essential step in running the program in conjunction with a machine. Indeed, Rimini's software expert testified at trial, without any rebuttal, that RAM copies are "an essential step in using software," and that their creation is "an inherent part of how computers work." 6-ER-930:7–931:18; *see also* 6-ER-930:23–25 ("[I]t's inherent in the function of computers, and it is an essential step in how software is executed."), 941:13–942:23 (testifying multiple times about various copies, including RAM copies, being "essential steps" in the process of using the software). The district court committed reversible error in rejecting Rimini's Section 117(a) defense.

### III. The District Court Erred in Construing the Database and PeopleSoft Licenses.

The district court committed two additional legal errors in construing the Oracle Database and PeopleSoft license agreements.  Those errors require reversal.

#### A. Erroneous Imposition of "Facilities" Restriction (Database).

The district court erred when it held that Rimini infringed Oracle Database licenses by having "copies of Database on *its own computer systems*."  1-ER-168 (emphasis added).  No Database license contains any such restriction, Oracle did not even argue for such a construction at trial, and it was reversible error to hold Rimini liable on this basis.  As this Court recently held when reviewing an identical Oracle Database license, "it is not apparent from the [Database license's] plain language" that any "location restriction was intended," and "Oracle points to no location restriction in the [license]."  *Oracle*, 81 F.4th at 855 (reversing a finding of contempt as to Oracle Database).

To be clear, Oracle previously included in many of its older *PeopleSoft* license agreements a provision restricting the licensee's use of PeopleSoft to the licensee's "facilities."  2-ER-296.  But as the district court noted at summary judgment, "[t]he 'facilities' limitation is restricted to *just these legacy PeopleSoft licenses*, as both newer PeopleSoft licenses and licenses for other software do not contain the restrictive 'facilities' language."  *Id.* (emphasis added).

The word "facilities" does not appear in any version of the Database license. *See* 9-ER-1882–1901, 1865–68, 1869–81. Oracle's Executive Vice President in charge of licensing worldwide, Richard Allison, conceded that no Database license in any version contains a "facilities" restriction. 6-ER-1086:12–1087:16, 1028:13–15. Just because there is such a restriction in *other* licenses, for *other* software lines, does not support reading the restriction into *Database* licenses. This Court has (correctly) held that infringement of a product line must be based on the terms of that product's license. *See Oracle*, 879 F.3d at 959 (certain PeopleSoft licenses "contain[] an *additional limitation*" regarding "[the licensee's] facilities" not found in the "J.D. Edwards and Siebel counterparts" (emphasis added)).

The Court should (once again) reverse the district court's imposition of a license restriction that does not exist in the underlying agreement.

## B. Erroneous Construction of "Internal Data Processing Operations" (PeopleSoft).

There is no dispute that the PeopleSoft licenses generally permit Rimini to create copies of PeopleSoft software in a client's development environment in developing updates for the client's PeopleSoft software. That is because Oracle's PeopleSoft licenses explicitly permit a licensee (and Rimini in its stead) to create copies of PeopleSoft "solely for [the] internal data processing operations" of the licensee. *E.g.*, 9-ER-1888. The district court committed critical errors in resolving

when such copies are unlicensed as not "solely for [the] internal data processing operations" of the licensee.

**1.** This Court has construed the "internal data processing operations" language in Oracle licenses twice before. In the first appeal, it held that the language prohibited Rimini from creating, under color of one client's license, generic development environments (environments not associated with any particular Rimini client), and using them to develop and test software updates not for any particular client, but for multiple clients at once. *See Oracle*, 879 F.3d at 956. This conduct came to be referred to as "cross-use." *Id.*

Following the "major changes" Rimini made in its support processes—"switching from cross-used *generic* development environments to *client-specific* development environments"—this Court construed the "internal data processing language" again. *Oracle*, 81 F.4th at 849 (emphases in original). It held that Rimini violated an injunction provision (which was based on the "internal data processing operations" language) by making copies in a particular client's development environment only where Rimini "*knew*" that the client did not in fact need a particular update or software fix but proceeded to develop the update in that client's software environment anyway and then delivered the update to a different licensed client. *Id.* (emphasis added). In that situation, this Court explained, the copies created in the client's development environment provided *no benefit* to that client;

rather, the copies existed in one client's environment *only* "to support *other* customers." *Id.* at 853 (quotation marks omitted). "Without any finding that Rimini used the [client]'s development environment for the benefit of [that client], the [client]'s license doesn't protect Rimini's cross use." *Id.* at 853–54.

The district court previously applied this understanding—both in *Rimini I* and *Rimini II*. On summary judgment in *Rimini II*, the court held that Rimini engages in "cross-use" when it "uses one customer's software licenses for the ***direct** benefit* of other customers." 2-ER-213 (emphasis added); *see also* 2-ER-293. And in the contempt proceedings, the court held that Rimini does *not* engage in "cross-use" when it uses work done in one client's environment as a "test case for multiple customers" (7-ER-1280), and similarly that Rimini did not engage in "cross-use" when it developed a "one size fits all" update "that could be used across multiple customers" and delivered it to multiple clients that needed it (7-ER-1244).

**2.** The district court contradicted these prior holdings in two critical respects when construing the "internal data processing" language in its post-trial bench order and resulting injunction. Each of these errors warrants reversal.

***"Manually" Versus "Automatically" Created Copies.*** The district court correctly held that the license to use Oracle software for "internal data processing operations" allows Rimini through "manual" support processes to create copies in one client's environment that, while benefiting that client, *also* have downstream

benefits to other licensed clients. Yet, in the same order, the district court inexplicably held that the license language forbids the use of "automated" support tools to make the *exact* same copies. That distinction finds no support in the text of the license agreements and should be reversed.

The district court's declaratory judgment of *non-infringement* regarding Rimini's "manual" support for licenses of Oracle's EBS software (1-ER-166–67, 206) closely tracks this Court's prior constructions of the "internal data processing" license language. In this process, when two clients need the same update, a Rimini engineer will remotely log into Client A's EBS development environment, develop and test the entirely Rimini-written update in that environment, and then deliver the Rimini-written update to Client A for implementation into Client A's live-running production environment. *See* 6-ER-1018:10–1020:17 (Rimini's Senior VP for Global Support describing this process), 926:1–927:19 (Rimini's expert); 1-ER-71–72, 166–67 (district court); 6-ER-1130:6–17 (Oracle's expert). During this process, the engineer records the steps necessary to perform the update in a "technical specification," which may sometimes include the code written by the Rimini engineer to effectuate the update. 6-ER-1020:3–17, 1130:6–17, 935:5–12; 1-ER-71–72, 166–67.[3] After this process, the engineer (or a different engineer) uses this

---

[3] Technical specifications are a "standard and accepted practice" in software support and are used by an engineer to document the steps he or she took to

technical specification to implement the same update for Client B. *See* 6-ER-1020:3–1021:23, 1130:9–17; 1-ER-71–72, 166–67; *see also* 6-ER-1022:1–1023:19 (Rimini's Senior VP for Global Support testifying about two representative technical specifications for EBS updates).

The Rimini engineer necessarily creates "RAM copies of Oracle's EBS software during development and testing of" the update in Client A's environment, and the technical specification for the update was also "created using copies of EBS software in [Client A's] environment." 5-ER-757; *see also*, *e.g.*, 6-ER-930:4–932:11 (RAM copies of Client A's Oracle environment are automatically and necessarily made during this process). Oracle did not dispute that those copies facilitated the internal data processing operations of Client A. *See*, *e.g.*, 6-ER-1133:22–1134:16 (Oracle's expert agreeing that "[a]t the time the tech[nical] spec[ification] was created, copies of the software were used … for [the first client]"); 6-ER-1118:17–1119:4 (Client A "certainly benefits from" development

---

effectuate an update. 6-ER-987:16–988:3, 1096:2–1097:11 (use of technical specifications is also taught in computer science courses). Under Rimini's Process 2.0, Rimini's technical specifications are written entirely by Rimini and contain *only Rimini-written* code and (occasionally) *de minimis* snippets of Oracle code that the Court found non-infringing. *See* 1-ER-166–67 (Rimini technical specifications may contain "de minumus [sic] snippets of Oracle's code"); 6-ER-1046:9–1047:8 (technical specifications "don't contain any Oracle IP"), 1099:16–1100:23, 935:5–12. Oracle did not identify at trial any Rimini technical specification written after the change to Process 2.0 that contained more than *de minimis* snippets of Oracle code.

work done in its environment); 5-ER-757. But Oracle argued that those RAM copies violated the "internal data processing" restriction because they *also* provided some *indirect* benefit to subsequent clients that received the same update. 5-ER-714, 717–18, 757.

The district court properly rejected that theory. The licenses permit copies of Oracle software made to facilitate the client's internal data processing operations, regardless of whether those copies *also* provide some attenuated benefits to other clients. This is the only workable standard in the context of enterprise software testing, development, and support. As Oracle's expert acknowledged, where two licensed clients need the same or similar update or fix, Rimini may "choose whichever environment [to] start work in" that it wants without running afoul of the "internal data processing operations" provision. 6-ER-1137:16–25. When Rimini is providing support to a licensed client that authorized the work—and the work in fact aids the client's data processing operations—it is immaterial that the same copy may also indirectly benefit subsequent licensed clients with the same or similar needs.

However, the district court then inexplicably held that the "internal data processing operations" language prohibits Rimini from using its *automated* PeopleSoft software tools to create copies that are *functionally identical* to those made in Rimini's manual EBS support process. 1-ER-57, 159–60, 201; *compare* 1-

ER-159 ("all" RAM copies made during the operation of Rimini's automated tools are infringing "cross-use"), *with* 1-ER-201 (Rimini may "lawfully" complete "PeopleSoft development either from scratch in each client's environment … , or using technical specifications … and by doing development work manually rather than by using Rimini's automated tools").

There is no functional or material difference between copies that are made "manually" or "automatically" via Rimini's support processes for purposes of construing the "internal data processing operations" language in Rimini's clients' licenses. The "automatic" version of Rimini's support process where two clients need the same update is *materially identical* to the manual support process described above. In this version, the Rimini engineer would first remotely log into the PeopleSoft development environment of Client A, creating a copy of the Oracle software before and after developing the update. *See* 6-ER-1103:4–1104:25. The engineer would then use a software tool that compares the code in the before and after files, generates a file that represents the differences (and *does not* contain Oracle code), and sends that information back through Rimini's systems and then, remotely, into Client B's environment. *See* 6-ER-1050:6–1067:19. While there can be additional steps in Rimini's automated processes (such as the program "batching" clients together to more efficiently send the file to all clients with similar needs),

both the manual and automated processes create RAM or other copies of Oracle software, and both processes create records of Rimini's changes to that software.[4]

There is nothing in the relevant license language to support a holding that RAM copies made when Rimini "manually" creates an update *are* for the "internal data processing operations" of Client A and thus non-infringing, while identical RAM copies made using "automated tools" are *not*. Indeed, such a distinction is illogical given that even the "manual" development of an update (as discussed above) "automatically" creates RAM copies of Oracle software. 6-ER-1109:10–1113:25, 1114:25–1115:4. The Court should thus reverse the district court's holding that RAM and disk copies created using Rimini's automated tools infringe and vacate the portions of the injunction regarding those tools.

***"Outright" Delivery of Updates.*** The district court also erred in holding that the "internal data processing operations" language prohibits Rimini from creating an update for a client and then providing the update "outright" to subsequent clients that have the same or similar needs, without further testing or development of the update and/or through an automated process of delivery. *See*, *e.g.*, 1-ER-13–14 ("Rimini violated Oracle's copyright when it developed an update in Rimini client

---

[4] Indeed, Oracle advanced the *exact same* theory of "cross-use" as to Rimini's automated tools as it did regarding Rimini's manual EBS support process. *Compare*, *e.g.*, 5-ER-761–62, *with* 5-ER-739, 849; *see also* 6-ER-1014:22–1015:7.

the City of Eugene's PeopleSoft environment and then gave that update outright to three other clients[.]"); 1-ER-61 (Rimini's tools infringe in part because they send updates "outright to other customers" that need the same update).

Whether an update is subsequently delivered to clients "outright" or by an engineer who manually tests the update in a subsequent client's development environment is *immaterial* to whether copies made in initially developing the update facilitated the "internal data processing operations" of the first client. Nothing in the license language requires Rimini to take additional steps after drafting its *own update* for a licensed client before delivering that same update to other licensed clients that also need it.[5]

## IV.    The District Court Erred in Applying the Lanham Act to Statements of Opinion and Puffery.

The district court erred in enjoining Rimini from making nonactionable statements of opinion and puffery. "[W]hether an alleged misrepresentation 'is a statement of fact' or is instead 'mere puffery' is a legal question" subject to de novo review. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008); *see also Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242,

---

[5] Because the district court's infringement findings should be overturned for multiple independent reasons, its corresponding findings of vicarious infringement as to Mr. Ravin should also be overturned. *See Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1092–95 (9th Cir. 1994) (vicarious infringement liability rests on underlying direct infringement liability).

245 (9th Cir. 1990) ("[W]e … may determine as a matter of law whether [an] alleged misrepresentation is a statement of fact, actionable under the Lanham Act, or mere puffery.").

To prove false advertising under the Lanham Act, Oracle had to show that the challenged statements were "false or misleading representations of *fact*, not simply statements of opinion." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021) (emphasis added). Statements of opinion and "puffery"—"exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely"— are "not actionable" under the Lanham Act. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). "Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal*, 513 F.3d at 1053. Statements may be actionable if they are "specific and measurable" (*Southland*, 108 F.3d at 1145) and "describe (or misdescribe) any specific or absolute characteristic" of a product (*Newcal*, 513 F.3d at 1053). *See also Edmundson v. Procter & Gamble Co.*, 537 F. App'x 708, 709 (9th Cir. 2013) (statements that reference "particular product characteristics or 'criteria'" that "can be tested" are actionable). By contrast, "a general, subjective claim about a product is non-actionable puffery" (*Newcal*, 513 F.3d at 1053), including "advertising which merely states in general terms that one product is superior" (*Cook*, 911 F.2d at 246 (cleaned up)).

Nearly all of the 15 statements the district court enjoined relate to Rimini's and Oracle's competing software security offerings. Oracle offers security-related fixes or Critical Patch Updates ("CPUs") to customers in conjunction with their purchase of Oracle's software support. 6-ER-1142:5–18. Oracle makes CPUs available only to customers that have active Oracle support contracts and only for more recent release versions of the software. 6-ER-1145:3–1146:1, 1008:1–6. Rimini cannot create certain types of security fixes because, based on Oracle's policies, Rimini typically does not have access to the necessary layer of source code. 6-ER-1001:8–11. Rimini offers alternatives to Oracle's CPUs, including a technology referred to as "virtual patching." *See* 6-ER-961:20–23, 967:5–18, 964:10–17.

Each of the statements at issue here is a general, subjective, and unquantifiable assertion by Rimini either touting the superiority of Rimini's security offerings or criticizing Oracle's product. For example, the enjoined statements include assertions that Rimini's security approach "is not risky"; is "holistic"; "*can* serve as a replacement for Oracle patching"; "*can* be more comprehensive, more effective, faster, safer and easier to apply" than CPUs; and offers "more security" and "helps clients proactively maintain a more secure application" than Oracle's approach. 1-ER-6–7 (emphases added). They also include statements that Oracle's CPU-approach to security is "outdated and provide[s] ineffective security protection," is

49

"no longer relevant," and provides "little to no value to customers"; that customers using older software versions have "no real need" for and "probably cannot apply" Oracle CPUs; and that "Oracle's CPUs are unnecessary to be secure." *Id.* (full list of statements).[6]

These statements constitute nonactionable puffery because they are high-level, subjective assertions of product superiority, not "specific and measurable" (*Southland*, 108 F.3d at 1145) claims that describe "specific or absolute characteristics of a product" (*Newcal*, 513 F.3d at 1053). This Court's analysis in *Cook* is instructive. There, the Court explained that "an advertiser's statement that its lamps were 'far brighter than any lamp ever before offered for home movies'" was rightly deemed puffery. 911 F.2d at 246. However, a statement that "quantified numerically the alleged superior brightness"—*e.g.*, a claim like "35,000 candle power and 10-hour life"—*was* a specific and measurable claim that could be proven

---

[6] The only statement enjoined by the district court that is arguably quantifiable is the statement that Rimini's security services "can pinpoint and circumvent vulnerabilities months and even years before they are discovered and addressed by the software vendor [Oracle]." 1-ER-7. But at trial, Oracle did not address this assertion and instead attacked a *different statement*, offering testimony from its expert that it was "not feasible" that a technology could "pinpoint future vulnerabilities *before they even exist*." 6-ER-1004:2–9 (emphasis added). Relying exclusively on this testimony, the court enjoined Rimini (1-ER-101), without ever analyzing the specific assertion made by Rimini, and despite Rimini presenting uncontested evidence that it *had* identified and addressed specific vulnerabilities before Oracle released a patch (6-ER-970:21–971:7).

literally true or false. *Id.* In subsequent cases, this Court has repeatedly drawn the same line between subjective, general claims, and specific assertions about absolute product characteristics that can be measured and shown to be literally false. *See Newcal*, 513 F.3d at 1052 (promise to "deliver 'flexibility'" and provide "lower copying costs for consumers" is puffery; promise to "deliver 95% up-time service" is measurable and actionable); *Southland*, 108 F.3d at 1145 ("Less is More" is nonactionable puffery; "50% Less Mowing" is "specific and measurable"); *Ariix*, 985 F.3d at 1121–22 (comparative "five-star ratings" in guide to nutritional supplements, even when purportedly based on "scientific and objective criteria," were "inherently subjective" and "classic, non-actionable opinions or puffery"; assertions that supplement manufacturer did not comply with FDA guidelines or achieve laboratory certification were "specific and measurable").

The generalized assertions that Rimini provides "more security," "helps clients proactively maintain a more secure application," or applies an approach that "*can be* more comprehensive, more effective, [etc.]" than Oracle's are not testable, specific descriptions of any feature of Rimini's security offering; they are "advertising which merely states in general terms that one product is superior." *Cook,* 911 F.2d at 246 (cleaned up); *see also Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665, 672 (9th Cir. 2023) (statement that competitor's product is "better" not actionable; statement that competitor's software products

were "malicious" and a "threat" could be statements of "objective fact"). Similarly, Rimini's claims that its support is "holistic" and "not risky" are not specific, measurable assertions that can be tested. *Cf. Brown v. Madison Reed, Inc.*, 2023 WL 8613496, at *2 (9th Cir. Dec. 13, 2023) ("Ammonia-Free" claim was capable of being measured; claim that product had "Ingredients with Integrity" was nonactionable puffery).

Oracle did not identify a specific factual assertion in any of Rimini's high level, subjective statements that was even capable of being proven true or false. Oracle did not attempt, for example, to show that Rimini's customers were subject to more security breaches than Oracle's customers, or anything to that effect. Nor could it; there was no evidence that any of Rimini's 1,000+ customers experienced a security breach while receiving Rimini support. 6-ER-1151:3–5, 1009:1–14, 908 (56:14–56:17). Moreover, although Oracle's security expert opined at trial that Oracle software customers need to apply Oracle CPUs to be secure, he readily acknowledged that "security experts can reasonably disagree on what constitutes adequate security," and that Rimini's security expert was one such "expert in security issues" that in fact disagreed with him. 6-ER-1006:9–1007:13. And for its part, despite recognizing (in rejecting Rimini's UCL claim) that "statements implying superior services than those of a competitor are puffery" (1-ER-189), the district court held that Rimini's product superiority claims were "factual" without

purporting to identify the specific portion of the statements that was purportedly quantifiable or measurable.  1-ER-178–82.

Finally, in analyzing whether a statement is puffery or a factual assertion, the Court looks to whether, in context, the statement is likely to induce customer reliance.  *See Cook*, 911 F.2d at 246.  Here, Oracle's own witnesses admitted that licensees of Oracle software—the target audience for these statements—are "some of the most sophisticated companies in the world" (6-ER-1149:13–15), that "take the security of their systems seriously" (1149:10–12) and "take careful steps to protect against security vulnerabilities" (1150:10–13).    Thus, unsurprisingly, Oracle's "causation expert" Mr. Pinto admitted at trial that he did not identify "any customers that left Oracle and went to Rimini because of a statement about security." 6-ER-993:7–11.   Indeed, an Oracle support customer testified at trial that, even before considering a move to Rimini, it had already made the decision *not* to apply Oracle CPUs.  6-ER-922:6–923:1.

In short, the evidence showed that Rimini's general statements about the irrelevance of Oracle CPUs and the benefits of Rimini's approach were "precisely the type of generalized boasting upon which no reasonable buyer would"—or even did—"rely."  *Southland*, 108 F.3d at 1145; *see also Cook*, 911 F.2d at 246 ("The common theme that seems to run through cases considering puffery in a variety of

contexts is that consumer reliance will be induced by specific rather than general assertions.").

The enjoined statements constitute nonactionable puffery, and the court erred as a matter of law in concluding that the challenged statements were actionable under the Lanham Act.

## V.     The Permanent Injunction Is Contrary to Law and Equity.

Even if the district court's liability findings are affirmed, the district court erred and committed multiple abuses of discretion in issuing the permanent injunction.  The injunction should be vacated.

### A.     The Injunction Is Overbroad.

Copyright injunctions may issue only when "reasonable to prevent or restrain infringement on a copyright."   17 U.S.C. § 502(a).   The scope of a copyright injunction must be limited to adjudicated conduct and "narrowly tailored … to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law."  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (per curiam) (quotation marks omitted); 5 *Nimmer on Copyright* § 14.06[C][1][a] ("scope of the injunction should be coterminous with the infringement").   The injunction here—ordering Rimini to delete hundreds of thousands of files, the vast majority of which are stored on *clients'* (not Rimini's)

servers—reaches far beyond "those individual rights that Plaintiffs are permitted to enforce in this action" and must be vacated. *Price*, 390 F.3d at 1117.

*First*, although the district court found that a small set of files beginning with an "RS" or "RSI" naming prefix infringed because they were shown to contain portions of Oracle code, the injunction sweepingly prohibits Rimini from ever using or copying, and requires Rimini to permanently delete, "*any* file beginning with an 'RS' or 'RSI' prefix" that has been sent to a client via Rimini's "TransferFiles" tool. 1-ER-4–5 (emphasis added). This court-ordered culling of any file saved with *Rimini's initials* obviously extends to countless Rimini-created files that contain *no* Oracle code or expression of any kind, were never at issue in trial, and were never alleged (let alone found) to be infringing, including files created after the March 2018 discovery cutoff for this case. 3-ER-370–71, 373, 374; 1-ER-18. It would be like ordering Simon & Schuster to destroy every book bearing its logo after finding that one book that it published infringed.

*Second*, the injunction prohibits Rimini from ever using or making a copy of, and requires Rimini to permanently delete, "regardless of [its] location," "any version of TAX960ST.SQR." 1-ER-4. But that is a standard *Oracle* file and core component that *comes with* the original PeopleSoft software that every Rimini client has a license to use and hire Rimini to support. Although the district court found that, for certain clients, Rimini had rearchitected and distributed this file in an

infringing manner, the court's injunction reaches far more broadly to *any version* of TAX960ST.SQR (modified by Rimini or not; distributed by Rimini or not).

*Third*, the injunction commands that "Rimini may not copy, distribute, prepare derivative works from, or use any version of the files identified in P-4940 and P-4941," and requires Rimini to "immediately and permanently delete all copies of" these files. 1-ER-5. Those trial exhibits list "DAT files"—data files used to load data into a database—that Oracle claimed were infringing, despite containing no copyrightable expression. 5-ER-728. But the district court held that "Oracle *has not met its burden*" of showing infringement "as to Rimini's use of … DAT files." 1-ER-156, 45–46, 158 (emphasis added). The unexplained enjoining of DAT files found explicitly to be non-infringing is clear reversible error.

The injunction's obvious overbreadth requires that it be vacated. *See Young v. City of Simi Valley*, 216 F.3d 807 (9th Cir. 2000).

## B. The District Court Erred in Enjoining *Non-Infringing* Materials to Punish *Past* Infringement.

To obtain injunctive relief, Oracle was also required to show that its "remedies available at law" for any of Rimini's unlawful conduct, "such as monetary damages, are inadequate to compensate for that injury." *E.g.*, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The district court fundamentally misapplied this standard when, to remedy *past* infringement—for which Oracle *could* have sought damages but affirmatively waived them on the eve of trial (7-ER-1190–92, 1178–

83)—it enjoined *non-infringing* materials. Oracle's decision to abandon its legal remedies (damages) does not render those remedies inadequate. *See, e.g., Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). None of the injunction's prohibitions on non-infringing materials are necessary "to prevent or restrain infringement" of Oracle copyrights (17 U.S.C. § 502(a)), and further support vacatur of the injunction.

For example, the injunction targets "any PeopleSoft software environment that Rimini reproduced or used as part of its Environments 2.0 (also referred to as Process 2.0) migration, including the PeopleSoft software environments listed in P-9008, and any subsequent copies of those environments." 1-ER-4. These client environments were found to be infringing solely because, prior to July 2014, they were stored in an impermissible location (Rimini's servers), and so Rimini moved them to what everyone agrees are permissible locations (clients' servers). *See* 1-ER-21–27. Despite the fact that the *only* way to migrate these environments off of Rimini's systems *required* Rimini to make copies of them (*see, e.g.*, 6-ER-1158:6–12, 974:8–12, 981:5–11, 955:16–956:5), the district court found that Rimini infringed Oracle's copyrights when it made copies of the environments in the process of migrating them to client servers (*see* 1-ER-25–26). Yet it is *undisputed* that each client that now possesses one of these environments has a license agreement that authorizes it to have and use the Oracle code contained therein.

Indeed, the district court conceded that Rimini could "rebuil[d]" the *exact environments* in the *exact locations* in which they are stored without infringing Oracle's copyrights. 1-ER-169.

Oracle has never disputed that it could have sought damages for Rimini's migration of these environments in 2014. Indeed, Oracle *did*, but abandoned those claims on the eve of trial. *See* 7-ER-1190–92, 1178–83. But the district court nevertheless enjoined Rimini's use of these environments and commanded that Rimini delete them from clients' systems. Ordering that deletion—only to permit Rimini to recreate the *exact* same environments in the *exact* same locations, but requiring a massive amount of work and causing severe disruption to clients—is plainly not "to prevent or restrain infringement" (there is no ongoing infringement at issue), but rather, to punish *past* infringement (the 2014 migration of these environments).

Similarly, the district court found that Rimini infringed Oracle's PeopleSoft copyrights in the manner it developed certain "rewrite" files. 1-ER-152. Rather than award damages for this past infringement (because Oracle abandoned all of its claims for damages), the court enjoined Rimini from accessing (or updating), and ordered Rimini to immediately and permanently delete from client systems, any version of those files. 1-ER-4–5. Yet there is *nothing* infringing about those files as they currently exist on client systems or may be updated by Rimini in client

environments.  Once again, the injunction's commands are completely untethered from any effort to restrain infringement; they are designed solely to punish Rimini for past infringement, when Oracle could have sought damages (either actual or statutory) for completed acts of past infringement.

## CONCLUSION

The Court should reverse the judgment, or, at minimum, vacate the district court's liability findings and the permanent injunction.

Respectfully submitted,

Dated:  March 4, 2024

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
(202) 682-7511
Mark.Perry@weil.com

Jeremy M. Christiansen
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

s/ Blaine H. Evanson

Samuel G. Liversidge
Eric D. Vandevelde
Blaine H. Evanson
Ilissa S. Samplin
Casey J. McCracken
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(949) 451-3805
BEvanson@gibsondunn.com

*Attorneys for Defendants-Appellants Rimini Street, Inc. and Seth Ravin*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____23-16038_____

The undersigned attorney or self-represented party states the following:

[**X**] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Blaine H. Evanson___          **Date** __March 4, 2024____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                          *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-16038_____

    I am the attorney or self-represented party.

    **This brief contains  13,647  words,** including   0   words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/ Blaine H. Evanson_____     **Date**   March 4, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                             *Rev. 12/01/22*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** _____ 23-16038_____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[**X**] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

OPENING BRIEF FOR APPELLANTS RIMINI STREET, INC. AND SETH RAVIN  <u>UNDER SEAL</u>

**Signature** __s/ Blaine H. Evanson_____ **Date** _March, 4, 2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 15**       *Rev. 12/01/18*

**ADDENDUM**

Pursuant to Circuit Rule 28-2.7, this addendum includes the following pertinent constitutional and statutory provisions, reproduced verbatim:

**Exhibit A**:  U.S. Const. art. I, § 8, cl. 8

**Exhibit B**:  17 U.S.C. § 101

**Exhibit C**:  17 U.S.C. § 103

**Exhibit D**:  17 U.S.C. § 117

**Exhibit E**:  17 U.S.C. § 202

**Exhibit F**:  17 U.S.C. § 502

# EXHIBIT A

**U.S. Const. art. I, § 8, cl. 8**

**Article I**

**Section 8: Powers of Congress**

The Congress shall have Power …

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries[.]

# EXHIBIT B

**17 U.S.C. § 101**

## § 101 – Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A "Copyright Royalty Judge" is a Copyright Royalty Judge appointed under section 802 of this title, and includes any individual serving as an interim Copyright Royalty Judge under such section.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovis-ual work, to show individual images nonsequentially.

An "establishment" is a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

A "food service or drinking establishment" is a restaurant, inn, bar, tavern, or any other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.

The "gross square feet of space" of an establishment means the entire interior space of that establishment, and any adjoining outdoor space used to serve patrons, whether on a seasonal basis or otherwise.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is—

      (1) the Universal Copyright Convention;

      (2) the Geneva Phonograms Convention;

      (3) the Berne Convention;

(4) the WTO Agreement;

(5) the WIPO Copyright Treaty;

(6) the WIPO Performances and Phonograms Treaty; and

(7) any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

A "performing rights society" is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

For purposes of section 513, a "proprietor" is an individual, corporation, partnership, or other entity, as the case may be, that owns an establishment or a food service or drinking establishment, except that no owner or operator of a radio or television station licensed by the Federal Communications Commission, cable system or satellite carrier, cable or satellite carrier service or programmer, provider of online services or network access or the operator of facilities therefor, telecommunications company, or any other such audio or audiovisual service or programmer now known or as may be developed in the future, commercial subscription music service, or owner or operator of any other transmission service, shall under any circumstances be deemed to be a proprietor.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means—

>  (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

>  (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if—

(1) in the case of a published work, the work is first published—

(A) in the United States;

(B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

(C) simultaneously in the United States and a foreign nation that is not a treaty party; or

(D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

(2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

(3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work of visual art" is—

> (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

> (2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include—

> (A)(i) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

> (ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

> (iii) any portion or part of any item described in clause (i) or (ii);

> (B) any work made for hire; or

(C) any work not subject to copyright protection under this title.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, nor the deletion of the words added by that amendment—

(A) shall be considered or otherwise given any legal significance, or

(B) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright

Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.

# EXHIBIT C

**17 U.S.C. § 103**

## § 103 – Subject matter of copyright: Compilations and derivative works

(a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

(b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

# EXHIBIT D

**17 U.S.C. § 117**

## § 117 – Limitations on exclusive rights: Computer programs

(a) Making of Additional Copy or Adaptation by Owner of Copy.—
Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

>(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

>(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

(b) Lease, Sale, or Other Transfer of Additional Copy or Adaptation.—
Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

(c) Machine Maintenance or Repair.— Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—

>(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and

>(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

(d) Definitions.—For purposes of this section—

(1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and

(2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

# EXHIBIT E

**17 U.S.C. § 202**

## § 202 – Ownership of copyright as distinct from ownership of material object

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

# EXHIBIT F

**17 U.S.C. § 502**

## § 502 – Remedies for infringement: Injunctions

(a) Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

(b) Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.