# No. 23-16038

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ORACLE INTERNATIONAL CORPORATION; ORACLE AMERICA, INC.,

> *Plaintiffs-counter-defendants - Appellees*,

v.

RIMINI STREET, INC.; SETH RAVIN,

> *Defendants-counter-claimants - Appellants*.

On Appeal From The United States District Court
For The District Of Nevada
No. 2:14-cv-01699-MMD-DJA, Hon. Miranda M. Du

## ANSWERING BRIEF OF APPELLEES ORACLE INTERNATIONAL CORPORATION AND ORACLE AMERICA, INC.

Benjamin P. Smith
Zachary Hill
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000
benjamin.smith@morganlewis.com
zachary.hill@morganlewis.com

David B. Salmons
Raechel Keay Kummer
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000
david.salmons@morganlewis.com
raechel.kummer@morganlewis.com

*Counsel for Plaintiffs-counter-defendants - Appellees*
(Additional Counsel Listed on Inside Cover)

April 3, 2024

William A. Isaacson
Karen Dunn
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
wisaacson@paulweiss.com
kdunn@paulweiss.com

Corey Ray Houmand
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
(650) 843-7524
corey.houmand@morganlewis.com

Richard J. Pocker
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
(702) 382-7300
rpocker@bsfllp.com

*Counsel for Plaintiffs-counter-defendants - Appellees*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Appellees Oracle International Corporation and Oracle America, Inc. certify that Oracle Corporation wholly owns, through one or more of its privately held wholly owned subsidiaries, the Appellees in this action:  Oracle International Corporation and Oracle America, Inc.  No other publicly held corporation owns 10% or more of the stock in any of the Appellees.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..........................................................................v

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION................................................................3

STATEMENT OF THE CASE AND THE FACTS............................................4

    I.      Rimini's Unlawful Business Practices .................................................4

    II.     *Rimini I* Proceedings, Permanent Injunction, and Contempt of Court ..........................................................................................5

    III.    *Rimini II* Summary Judgment and Ruling............................................6

    IV.    *Rimini II* Bench Order and Permanent Injunction ...............................7

    V.     Denial of Rimini's First Motion to Stay .............................................9

STANDARD OF REVIEW .......................................................................10

SUMMARY OF THE ARGUMENT ............................................................10

ARGUMENT ........................................................................................13

    I.      The District Court Correctly Held That Rimini's Updates And Automated Tools Are Infringing Derivative Works. .........................13

           A.     Rimini failed to prove that its updates were free of Oracle code. .....................................................................................14

           B.     The district court correctly applied this Court's derivative-works standard..........................................................18

           C.     Rimini's derivative works are not licensed.............................24

    II.     The District Court Correctly Struck Rimini's Section 117(a) Defense. ......................................................................................27

           A.     Binding circuit precedent forecloses Rimini's Section 117(a) defense. ...................................................................28

                  1.     *Vernor* sets the standard for determining ownership under Section 117(a)....................................28

2.  The district court properly applied *Vernor* and found that Oracle's licensees do not "own" its software copies. ...........................................29

3.  Applying *Vernor* does not create a circuit split............32

B.  Rimini's copying for other customers extends beyond an "essential step." ......................................................34

III.  The District Court Correctly Found That Rimini Infringed Oracle's Database and PeopleSoft Software Copyrights.................36

A.  Rimini infringed Oracle Database copyrights. ........................36

B.  Rimini infringed Oracle's PeopleSoft copyrights through cross-use. ..................................................................38

1.  Rimini's use of its automated tools constitutes impermissible cross-use..............................................39

2.  Rimini's "outright" delivery of updates proves that Rimini engaged in cross-use.........................................41

IV.  The District Court Correctly Held That Rimini Violated The Lanham Act. ......................................................................43

A.  Rimini's commercial statements about Rimini's and Oracle's relative security offerings are false and misleading. ...............................................................45

1.  Rimini's statements about software patching are literally false. ...............................................................45

2.  Rimini's statements about holistic security are literally false. ...............................................................47

3.  Rimini's statements about Oracle's and Rimini's relative security are literally false................................48

4.  Rimini's false statements are not mere puffery............50

V.  The Injunction Is Appropriately Tailored To Prevent Rimini's Ongoing Infringement. ......................................................52

A.    The Injunction appropriately orders the permanent
      deletion of infringing files. .......................................53

B.    The Injunction is aimed at preventing future infringing
      conduct. ..................................................................56

CONCLUSION ....................................................................60

FORM 17. STATEMENT OF RELATED CASES PURSUANT TO
      CIRCUIT RULE 28-2.6 ...............................................62

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............................63

# TABLE OF AUTHORITIES

Page(s)

CASES

*ABS Enter., Inc. v. CBS Corp.*,
908 F.3d 405 (9th Cir. 2018) ............................................................13

*Adobe Sys. Inc. v. Christenson*,
809 F.3d 1071 (9th Cir. 2015) ....................................................29, 34

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985)...........................................................................15

*Apple Comput. Inc. v. Franklin Comput. Corp.*,
714 F.2d 1240 (3d Cir. 1983) ...........................................................21

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011) ....................................................29, 34

*Apple, Inc. v. Psystar Corp.*,
673 F. Supp. 2d 931 (N.D. Cal. 2009).........................................21, 56

*Brownstein v. Lindsay*,
742 F.3d 55 (3d Cir. 2014) ................................................................18

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993) ..............................................................45

*Clorox Co. P.R. v. Proctor & Gamble Com. Co.*,
228 F.3d 24 (1st Cir. 2000)................................................................45

*Columbia Pictures Indus. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ...........................................................10

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
911 F.2d 242 (9th Cir. 1990) ..............................................44, 45, 50

*Creative Computing v. Getloaded.com LLC*,
386 F.3d 930 (9th Cir. 2004) .............................................................55

*Dun & Bradstreet Software v. Grace Consulting, Inc.*,
307 F.3d 197 (3d Cir. 2002) ..............................................................21

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
  69 F.4th 665 (9th Cir. 2023) .......................................................................*passim*

*Excelsior Coll. v. Frye*,
  345 F. App'x 241 (9th Cir. 2009) .......................................................................56

*Fed. Sav. & Loans Ins. Corp. v. Butler*,
  904 F.2d 505 (9th Cir. 1990) .............................................................................53

*Hiller, LLC v. Success 23 Grp. Int'l Learning All., LLC*,
  976 F.3d 620 (6th Cir. 2020) .............................................................................18

*In re R.M.J.*,
  455 U.S. 191 (1982).....................................................................................51, 53

*Indep. Towers of Wash. v. Washington*,
  350 F.3d 925 (9th Cir. 2003) .......................................................................17, 25

*Krause v. Titleserv, Inc.*,
  402 F.3d 119 (2d Cir. 2005) ........................................................................32, 35

*Latimer v. Roaring Toyz, Inc.*,
  601 F.3d 1224 (11th Cir. 2010) .........................................................................18

*LEGO A/S v. ZURU Inc.*,
  799 F. App'x 823 (Fed. Cir. 2020) ....................................................................18

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
  964 F.2d 965 (9th Cir. 1992) .................................................................22, 23, 24

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
  629 F.3d 928 (9th Cir. 2010) .............................................................................26

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007).............................................................56

*Micro Star v. Formgen Inc.*,
  154 F.3d 1107 (9th Cir. 1998) ....................................................................*passim*

*Oracle v. Rimini*,
  6 F. Supp. 3d 1086 (D. Nev. 2014)......................................................25

*Oracle v. Rimini*,
  81 F.4th 843 (9th Cir. Aug. 24, 2023) .......................................*passim*

*Oracle v. Rimini*,
  879 F.3d 948 (9th Cir. 2018) ...............................................5, 38, 42

*Orantes-Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) ...............................................60

*Orr v. Plumb*,
  884 F.3d 923 (9th Cir. 2018) ...............................................51

*Pac. & S. Co., Inc. v. Duncan*,
  744 F.2d 1490 (11th Cir. 1984) ...........................................60

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .............................................22

*Skydive Ariz., Inc. v. Quattrochi*,
  673 F.3d 1105 (9th Cir. 2012) .............................................44

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ...............................44, 45, 50

*Tr. Co. Bank v. MGM/UA Ent. Co.*,
  772 F.2d 740 (11th Cir. 1985) .............................................20

*UMG Recordings, Inc. v. Augusto*,
  628 F.3d 1175 (9th Cir. 2011) ...............................29, 33, 34

*United States v. Bell*,
  414 F.3d 474 (3d Cir. 2005) ...........................................51, 52

*United States v. Buttorff*,
  761 F.2d 1056 (5th Cir. 1985) ...........................................52

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Schiff,*
    379 F.3d 621 (9th Cir. 2014) ............................................................52

*Vault Corp. v. Quaid Software Ltd.,*
    847 F.2d 255 (5th Cir. 1988) ............................................................18

*Vernor v. Autodesk, Inc.,*
    621 F.3d 1102 (9th Cir. 2010) ....................................................*passim*

*William H. Morris Co. v. Grp. W, Inc.,*
    66 F.3d 255 (9th Cir. 1995) ..............................................................51

**STATUTES**

Copyright Act
    17 U.S.C. § 101 ...............................................................13, 18, 26
    17 U.S.C. § 106 ...........................................................................26
    17 U.S.C. § 117 ...................................................................*passim*
    17 U.S.C. § 502 ...................................................................53, 60

Lanham Act
    15 U.S.C. § 1125 .................................................................43, 44

**OTHER AUTHORITIES**

3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
    § 27.04 (3d ed. 1994) .......................................................................44

**INTRODUCTION**

Rimini Street, Inc. and its founder and CEO, Seth Ravin (together, "Rimini") are recidivist, contemptuous infringers. Oracle International Corporation and Oracle America Inc. (together, "Oracle") are in the creative business of developing and licensing software to their customers. Rimini's business "was built entirely on its infringement of Oracle's copyrighted software," 1-ER-152, and 14 years of litigation have shown that Rimini has continued to infringe and that Rimini deliberately lied about its deficient security offerings.

In its thorough and well-reasoned opinion, the district court found Rimini liable—once again—for vast amounts of copyright infringement. The district court rejected arguments Rimini made to this Court less than a year ago, when Rimini sought in vain to vacate the district court's contempt order in the prior case— asserting that it had "*fundamentally changed* its processes in response to prior court rulings" and that "*for several years* [Rimini] has not engaged in" infringing conduct. 1-SER-174 (emphases added). The district court's bench order and permanent injunction (the "Injunction") confirm that those assertions were false.

As the district court held, "despite all of Rimini's protestations to the contrary, most of Rimini's PeopleSoft support processes used during the *Oracle II* period, including after its transition to 'Process 2.0,' were built on impermissible cross-use: copying and using one customer's PeopleSoft software environment as a prototype

environment for developing and testing updates, or individual files within an update, for distribution to its other customers." 1-ER-152. Rimini does not even appeal many of the district court's infringement findings.

Once again, Rimini is unable to defend its actual conduct; and once again, it comes before this Court with a range of scattershot—and equally failing—contentions.

1.     Notwithstanding Rimini's blatant misreading of the opinion below, the district court correctly applied this Court's governing precedent on derivative works. *See Micro Star v. Formgen Inc.,* 154 F.3d 1107 (9th Cir. 1998) (foreclosing Rimini's arguments).

2.     While Rimini apparently seeks to manufacture a circuit split by upending decades of binding precedent, the district court correctly applied governing Ninth Circuit precedent on Section 117(a), which in turn correctly interprets the plain language of the Copyright Act. *See Vernor v. Autodesk, Inc*., 621 F.3d 1102 (9th Cir. 2010) (foreclosing Rimini's arguments).

3.     Rimini's contention that the district court "erred" in its license construction is simply incorrect. The district court's constructions of Oracle's Database and PeopleSoft licenses are supported by the record evidence and consistent with prior law of the case.

4. Rimini has not appealed—and thus concedes—multiple violations of the Lanham Act. Rimini's misleading statements about the superiority of its security are likewise literally false and thus actionable.

5. Despite Rimini's contentions to the contrary, the district court's Injunction is neither overbroad nor aimed solely at past infringement. The Injunction is tailored, is necessary, and should be affirmed.

As the district court made clear, Rimini certainly did not "mostly prevail[] in this case," as Rimini continues to claim. 3-ER-325. Rimini's myopic view of its success "is directly contrary to the Court's extensive findings in the Bench Order." *Id.* Rimini basically ignores the district court's factual findings on appeal—likely because the facts are devastating to Rimini's case.

Oracle sought the equitable relief it truly needs in the bench trial below, and Oracle won. Oracle owns the copyrights Rimini infringed; and as the copyright owner, Oracle is entitled to choose the relief it seeks. In each of Rimini's three prior appeals, this Court substantially affirmed the district court's order. This Court should once again affirm the district court's bench order and Injunction against Rimini's pervasive and persistent infringement.

## STATEMENT OF JURISDICTION

Oracle agrees with Rimini's statement of jurisdiction.

## STATEMENT OF THE CASE AND THE FACTS

### I.   Rimini's Unlawful Business Practices

Since 1977, Oracle has been in the business of creating, licensing, and supporting its own software—including PeopleSoft Enterprise Resource Planning ("ERP") software and Oracle Database ("Database") software often used in conjunction with ERP. Oracle offers comprehensive support for its products, but software licensees can modify and customize Oracle software for their own business purposes—provided that the modification and customization is consistent with their licenses.

Mr. Ravin founded Rimini in 2005 to compete with Oracle support by providing purportedly equivalent (or even superior) support services to some of Oracle's support offerings at a discount of 50% (or more) off Oracle's price. *See* 5-ER-657. Before Rimini, Mr. Ravin ran another third-party support company, TomorrowNow, which pleaded guilty to criminal infringement of Oracle's copyrights in 2011 based on support practices Mr. Ravin designed. 1-ER-104. While Rimini's discounted services are enticing to customers, Rimini's ability to provide support is limited in several respects. For example, Rimini cannot provide new versions of the software (as Oracle does in its support offering), and lacking access to certain portions of the source code, Rimini cannot provide security patches. 1-ER-99. Further, because Rimini does not have a license for any Oracle software

or support materials, it must operate under the restrictions of each customer's Oracle license.

For nearly twenty years, Rimini has knowingly operated according to a "business model … built entirely on its infringement of Oracle's copyrighted software." 1-ER-152. "Rimini would not have achieved its current market share and business growth without these infringing and illegal actions." 2-SER-352.

## II.   *Rimini I* Proceedings, Permanent Injunction, and Contempt of Court

In 2010, Oracle sued Rimini for copyright infringement. 1-ER-11. At summary judgment, the district court held that Rimini infringed Oracle's PeopleSoft software copyrights by, *inter alia*, engaging in unlawful "cross-use" by using one customer's software to support other customers, and infringed both PeopleSoft and Database copyrights by creating unlicensed copies of Oracle's materials on Rimini's computer systems. *See* 2-SER-347-68. At trial, a jury also found Rimini liable for infringement of Oracle's PeopleSoft, JD Edwards, and Siebel copyrights. 2-ER-210. The jury awarded Oracle $36.5 million in damages, and oracle was later awarded over $28.5 million in attorneys' fees. The district court entered a permanent copyright injunction, which this Court affirmed on nearly all issues. *See Oracle v. Rimini*, 879 F.3d 948 (9th Cir. 2018) ("*Rimini I*").

After new evidence showed that Rimini had violated the *Rimini I* injunction, Oracle initiated a contempt proceeding in 2020. The district court issued an order

to show cause on ten issues. 7-ER-1193. After a seven-day hearing, the district court held Rimini in contempt on five of those issues. 7-ER-1248.

On August 24, 2023, this Court upheld the contempt order on four of the five issues, each of which involved Rimini's unlawful copying of Oracle source code, and held that the district court did not abuse its discretion by sanctioning Rimini. *Oracle v. Rimini*, 81 F.4th 843 (9th Cir. Aug. 24, 2023) ("*Rimini I*").

### III. *Rimini II* Summary Judgment and Ruling

Rimini filed a second suit on October 15, 2014. 2-ER-211. Rimini contended that, in response to the *Rimini I* summary judgment against it, Rimini developed its purportedly non-infringing "Process 2.0," deployed after July 31, 2014. Rimini sought a declaratory judgment to that effect. *Id.* Oracle brought counterclaims for copyright infringement, as well as violations of the Digital Millennium Copyright Act ("DMCA") and the Lanham Act. 2-ER-212.

The district court "granted partial summary judgment to Oracle on many of Rimini's claims and some of Oracle's claims, leaving only specific claims predicated on specific theories for trial." 1-ER-11. The district court granted Oracle summary judgment on Rimini's claims under the Computer Fraud and Abuse Act (and state analogues), for intentional interference with contractual relations, under the Nevada Deceptive Trade Practices Act, and as to certain conduct under the California Business and Professions Code. 1-ER-12; 2-ER-216, 2-ER-220, 2-ER-224. As to

Oracle's claims, the district court granted Oracle summary judgment on its copyright-infringement claim based on Rimini's violation of the facilities restriction of 47 PeopleSoft licenses and rejected Rimini's express license defense to this claim, along with five other affirmative defenses. 1-ER-12; 2-ER-228, 2-ER-236. The district court also rejected Rimini's express-license defense regarding the migration of PeopleSoft software environments found infringing in *Rimini I*. 2-ER-299. Rimini does not appeal any of these rulings.

The district court also held that Rimini infringed Oracle's PeopleSoft copyrights by creating updates in Campbell's Soup's and the City of Eugene's PeopleSoft software environments for other customers in violation of the "internal data processing operations" provisions in the PeopleSoft licenses. 2-ER-245-62. Importantly, the district court held that the update created using the City of Eugene's PeopleSoft software environment was a derivative work. 1-ER-13-14; 2-ER-258-60. Rimini subsequently sought to certify an interlocutory appeal of the district court's derivative-works holding. 7-ER-1259. The district court denied certification stating, *inter alia*, there was not a "substantial ground for differences in opinion" because it "properly relied upon binding Ninth Circuit precedent." *Id*.

## IV. *Rimini II* Bench Order and Permanent Injunction

After an 11-day bench trial in *Rimini II*, the district court concluded that Oracle "prevail[ed]" on its DMCA and Lanham Act claims and "mostly prevail[ed]"

on its Copyright Act claims. 1-ER-3; *see also* 1-ER-59, 1-ER-74, 1-ER-131-32, 1-ER-146, 1-ER-164-66, 1-ER-205. The district court found, *inter alia*, that:

- Rimini is a "recidivist" infringer, 1-ER-199, that has taken a "'business as usual' approach to infringing Oracle's copyrights," 1-ER-22—including committing thousands of acts of copyright infringement, 1-ER-59;

- Rimini did not develop its Process 2.0 to comply with the *Rimini I* summary-judgment decisions; rather, this process was simply part of a business plan that pre-dated those rulings, 1-ER-21-22;

- Rimini lied repeatedly in sales and marketing materials regarding Rimini's processes and deficient security offerings, 1-ER-85-102;

- Rimini's and Mr. Ravin's infringement and Lanham Act violations were willful, 1-ER-81-82, 1-ER-86-87, 1-ER-104, 1-ER-124-25; and

- Rimini's and Mr. Ravin's infringement and false statements "caused customers" to leave Oracle and contract with Rimini, resulting in irreparable harm to Oracle, 1-ER-194-97.

The district court enjoined Rimini and Mr. Ravin—who was also found personally liable—from engaging in specific unlawful acts, prohibited them from making false and misleading statements about Rimini's services, and ordered Rimini to correct its prior false statements in a press release. 1-ER-6-9. The day after the district court's ruling, "Rimini issued a misleading press release" that entirely fails to mention the Injunction and incorrectly "suggests that Rimini mostly prevailed" in *Rimini II*. 3-ER-325.

## V.    Denial of Rimini's First Motion to Stay

Days after publicly claiming that the Injunction would *not* harm Rimini, Rimini filed an "emergency" motion to stay its enforcement. 3-ER-321. The district court denied that motion on August 15, 2023, ruling that Rimini failed to satisfy the four required factors and emphasizing Rimini's inability to show that it would be irreparably harmed absent a stay. 3-ER-323. In addition to finding "several components of Rimini's irreparable harm argument … legally unpersuasive," the district court concluded that "Rimini's own conduct … contradicts its representations of irreparable harm to the Court." 3-ER-324. The district court further expressed concern that Rimini had "not yet complied" with the Injunction, that Mr. Ravin "would not definitively state that Rimini would comply" with the Lanham Act portions of the Injunction, and that "Rimini and Mr. Ravin are publicly representing that the Injunction will not irreparably harm Rimini while their attorneys and Mr. Ravin's subordinates are arguing to the Court—under penalty of perjury—that it will." 3-ER-326-27. The district court noted that Rimini's conduct "fits a pattern" that warranted issuance of the Injunction in the first place: "Rimini's noncompliance with Judge Hicks' prior orders [in *Rimini I*]." 3-ER-326.

The district court denied Rimini's request for a stay pending appeal but granted a temporary administrative stay to allow this Court to consider the stay

factors itself.  3-ER-330.  Rimini filed a request for a stay in this Court, and that motion remains pending.

## STANDARD OF REVIEW

The decision to grant a permanent injunction is reviewed for abuse of discretion, as is the injunction's scope.  *Columbia Pictures Indus. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013).  The circuit court will not disturb the district court's fact findings unless they are clearly erroneous.  *Id.*

## SUMMARY OF THE ARGUMENT

Recidivist infringer Rimini returns to this Court seeking vacatur of the district court's warranted and necessary Injunction against Rimini's continued copyright infringement and lies.  Once again, Rimini's arguments fail in the face of binding precedent and the district court's well-supported factual findings.

*First*, Rimini opens its brief before this Court with an erroneous exposition on the law of derivative works.  Rimini assails the district court's holding that its updates and automated tools are infringing derivative works—but Rimini is wrong on the law *and* the facts.

Rimini's assertion that "countless" of its updates and tools "contain no Oracle code or expression of any kind" is unsupported by the record and contrary to an express factual finding by the district court.  1-ER-156 ¶ 43 ("Rimini has asserted that many of its PeopleSoft updates contain only Rimini-written expression. The

Court concludes that these assertions are not supported by the evidence. Even if they were, the facts established by Oracle at trial show that Rimini's PeopleSoft updates substantially incorporate protected Oracle expression and are derivative works under Judge Hicks' prior rulings and the Ninth Circuit's *Micro Star* precedent."). The district court also applied the proper legal standard when it held that Rimini's updates and tools "substantially incorporated" Oracle expression. As in *Micro Star*, 154 F.3d 1107 (9th Cir. 1998), Rimini's infringing updates and automated tools are designed to modify and extend Oracle's software, are only usable with Oracle's software, and were created using Oracle's software tools. Finally, Rimini's halfhearted assertion that these derivative works were licensed once again misinterprets the relevant license provisions and omits their major cross-use limitations.

*Second*, the district court properly struck Rimini's purported Section 117(a) defense in a straightforward application of governing Ninth Circuit precedent. 17 U.S.C. § 117(a). As the district court recognized in 2015, *Vernor*, 621 F.3d 1102 (9th Cir. 2010), forecloses Rimini's argument that Oracle's software licensees are "owners" under Section 117. *Vernor* remains the governing Ninth Circuit law almost nine years later.

*Third,* and equally meritless, are Rimini's arguments that the district court misconstrued the Oracle Database and PeopleSoft licenses. Contrary to Rimini's

assertion, the district court did not impose a facilities restriction on the Database license. Rather, the district court held that the copies of Database that Rimini created on its systems during the *Rimini II* time period were infringing for the same reasons they were during the *Rimini I* time period—an infringement holding Rimini forfeited its right to contest on appeal. As for the district court's rulings on cross-use, Rimini once again attempts to escape the plain sweep of this Court's prior holdings and the district court's faithful application of them. Rimini also fails to mention the numerous additional infringing copies that result when it uses its automated tool—a cornerstone of its supposedly "new" process.

*Fourth,* Rimini does not appeal and thus concedes a portion of the district court's holdings that Rimini violated the Lanham Act. Rimini contends that its demonstrably false commercial statements regarding Oracle's and Rimini's security offerings were mere "puffery"—but that argument fails in the face of the district court's well-supported factual findings. As both parties' experts and Rimini's own founder recognized, Rimini's statements regarding comparative security are literally false. These actionable statements weren't just *likely* to deceive customers; the district court found as a matter of fact that Rimini's false statements *did* influence customers to forgo Oracle's necessary security patches in favor of inferior virtual patches, which Rimini bought from a third party and sold to customers for an

additional price.  The district court correctly enjoined Rimini from making substantially similar false statements in the future.

*Finally,* Rimini attacks the Injunction as purportedly overly broad and aimed exclusively at punishing past infringement.  To the contrary, the Injunction is appropriately tailored to prevent Rimini's ongoing infringement.  The Injunction should be affirmed in its entirety.

## ARGUMENT

## I.  The District Court Correctly Held That Rimini's Updates And Automated Tools Are Infringing Derivative Works.

Ninth Circuit precedent forecloses Rimini's lead argument.  Faithfully applying *Micro Star*, the district court correctly held that Rimini's updates and automated tools constitute derivative works.

"A 'derivative work' is defined in the Copyright Act as a work 'based upon one or more preexisting works' that 'recast[s], transform[s], or adapt[s]' a preexisting work and 'consist[s] of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship.'" *ABS Enter., Inc. v. CBS Corp.*, 908 F.3d 405, 414 (9th Cir. 2018) (alterations in original) (quoting 17 U.S.C. § 101).  This Court has held that derivative works must (1) exist in a concrete or permanent form and (2) "substantially incorporate protected material from the preexisting work." *Micro Star*, 154 F.3d at 1110.  No one disputes that Rimini's updates and automated tools exist in a concrete and permanent form.

Instead, Rimini claims that there were "countless instances of Rimini files that contained no protected Oracle expression whatsoever (literal or non-literal)" and that, as to these files, the district court applied the wrong legal standard. Rimini Br. 15. That's just wrong.

First, Rimini claimed below that many of its PeopleSoft updates did not contain Oracle code. The district court disagreed, finding that Rimini's assertion was "not supported by the evidence." 1-ER-156. Rimini has failed to meet its burden to show that the district court's factual finding was clearly erroneous. Second, the district court correctly applied the controlling legal standard when holding that Rimini's updates and automated tools substantially incorporate Oracle expression and thus constitute infringing derivative works.

## A. Rimini failed to prove that its updates were free of Oracle code.

As the district court found, many of Rimini's updates were derivative works *containing Oracle code*. *See* 1-ER-35-37, 1-ER-39, 1-ER-40-41 (listing and describing numerous Rimini update "RSI" files containing Oracle code); 1-ER-36 ("In many instances, Rimini directly copied substantial portions of protected expression from Oracle's PeopleSoft source code files to create its 'one code for all' or RSI files."). The district court correctly held, without dispute on appeal, that updates containing Oracle code are derivative works: Rimini's appeal on derivative

works is limited to what it asserts were "100% Rimini-written files that contain no protected Oracle expression." Rimini Br. 15.

But Rimini never proved the existence of any such "Rimini files that contained no protected Oracle expression whatsoever." *Id.* To the contrary, the district court found that Rimini's assertion "that many of its PeopleSoft updates contain only Rimini-written expression" was "*not supported by the evidence*." 1-ER-156 (emphasis added). To rebut this finding on appeal, Rimini must show that it was clearly erroneous—not "plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574 (1985). Rimini has not met, and cannot meet, that demanding standard. At trial, Rimini frequently, and incorrectly, suggested that to determine whether an update or tool was a derivative work an expert needed to perform analytic dissection—a process whereby an expert separates unprotected portions of the copyrighted work from the protected portions. *See, e.g.*, 1-SER-122-23 (arguing that analytic dissection was necessary to determine if RSI files were infringing). Yet Rimini never performed analytic dissection on any of its updates or tools. *See* 1-ER-38 ("Neither Professor Astrachan nor any other Rimini witness rebutted Ms. Frederiksen-Cross's analytic dissection analysis."). Therefore, Rimini did not even present the evidence it previously argued was necessary to show whether its updates were derivative works.

Rimini's string of citations—6-ER-1072:16-1073:20; 6-ER-938:12-18; 6-ER-945:15-23; 6-ER-948:15-23; 6-ER-949:20-952:14—includes a reference to only *one specific file*. And that file is a "technical specification," 6-ER-1072:16-17, which the district court already ruled was not a derivative work. *See* 1-ER-157 ("The Court does not find that Rimini's technical specifications infringe Oracle's copyrights except those containing portions of Oracle code ('locators') that Judge Hicks already found infringing in *Oracle I*."). The other citations are to Rimini's expert's testimony that Rimini's automated tools do not include Oracle code or protected material. However, Rimini's expert did not identify or introduce any actual files, and admitted, *inter alia*, that Rimini's automated tools are "used with PeopleSoft exclusively," "execute[] Oracle software," are run "within the client's environment," "may invoke" Oracle software, and "their use may result in a modified environment." 6-ER-947:8-11, 6-ER-938:19-22, 6-ER-944:25-945:11, 6-ER-945:15-23, 6-ER-948:24-949:4. None of this testimony refers to specific Rimini files or shows that any particular file "contained no protected Oracle expression whatsoever," let alone "countless" ones.[1]

---

[1] Rimini is also incorrect that Oracle's expert labeled Rimini updates and tools "derivative works '*regardless*' of what they contained." Rimini Br. 15 (emphasis added) (citing 6-ER-1122:9-1123:24). Oracle's expert thoroughly analyzed Rimini's updates. To the extent Rimini cherry picks a piece of her testimony, Oracle's expert clarified that she applied the proper derivative-works standard. *See* 1-SER-51-53. In any event, the district court plainly found that many Rimini

Even if this Court were to disagree with the district court's derivative-works holdings (and it should not), that would not require "reversal of the judgment and vacatur of the injunction," as Rimini contends. Rimini Br. 25. The district court not only held that Rimini's updates and tools were infringing derivative works, but independently held both were "built on impermissible cross-use." 1-ER-152; *see also* 1-ER-160 ("The Court also concludes that Rimini's Automated Tools were created through impermissible cross-use because Rimini used and copied its customers' PeopleSoft software environments during the development and testing of the Automated Tools for the benefit of other customers, as well as for Rimini's benefit."). This district court's cross-use holding is an independent basis for the court's infringement findings and for the Injunction. Rimini has not even appealed this finding as to the automated tools. Rimini thus has forfeited any argument that its automated tools were not built on impermissible cross-use and are not infringing. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e will not consider any claims that were not actually argued in appellant's opening brief."). Given Rimini's waiver of any appeal as to cross-use on this issue, nothing about the Court's derivative-works holding would change the ultimate result that that these tools are infringing. Moreover, because the district court held that the

---

updates contained Oracle code and that all of its updates and tools substantially incorporated Oracle's protected expression.

updates were not only infringing derivative works but made using cross-use, a holding that updates are not derivative works would not render them non-infringing either.

**B.     The district court correctly applied this Court's derivative-works standard.**

Rimini claims the district court held that Rimini's updates can be considered derivative works even if they "contain no protected Oracle expression." Rimini Br. 15. Not so. The district court correctly held that "a derivative work … 'must substantially incorporate protected material from the preexisting work.'" 1-ER-143 (quoting *Micro Star*, 154 F.3d at 110). The district court's holding is consistent with both the text of 17 U.S.C. § 101 and the cases that Rimini cites from "five other circuits," all of which applied the same standard. *See* Rimini Br. 22-23 (citing *Brownstein v. Lindsay*, 742 F.3d 55, 68 (3d Cir. 2014); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988); *Hiller, LLC v. Success 23 Grp. Int'l Learning All., LLC*, 976 F.3d 620, 628 n.5 (6th Cir. 2020); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010); *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 829 (Fed. Cir. 2020)).

The district court held that Rimini's updates and tools substantially incorporated Oracle expression because they (1) were "extensions to and modifications of Oracle's copyrighted software," (2) were "developed and tested using Oracle's PeopleSoft software," (3) "cannot be used with any software

programs other than PeopleSoft," and (4) were created using Oracle tools.  1-ER-155-56.  Under this Court's precedent in *Micro Star*, this is more than enough for these updates and tools to constitute derivative works.

In *Micro Star*, this Court upheld a preliminary injunction prohibiting a developer (Micro Star) from selling additional levels to a copyrighted video game—Duke Nukem 3D—because those additional levels, on their own, constituted infringing derivative works.  154 F.3d at 1114.  The copyrighted game "consist[ed] of three separate components: the game engine, the source art library and the MAP files."  *Id*. at 1110.  Micro Star's additional levels were MAP files, each of which "contain[ed] a series of instructions that tell the game engine (and, through it, the computer) what to put where."  *Id*.  The MAP files were created using the game's Build Editor utility.  *Id.* at 1109.  Importantly, "[t]he MAP file describes the level in painstaking detail, but it does not actually contain any of the copyrighted art itself; everything that appears on the screen actually comes from the art library."  *Id*. at 1110.  Micro Star made an argument very similar to Rimini's here—that its "MAP files are not derivative works because they do not, in fact, incorporate any … protected expression."  *Id*. at 1112.  This Court rejected that argument because it "misconstrue[d] the protected work."  *Id*.  The Court reasoned that "[t]he work that Micro Star infringes is the [videogame] story itself. … A copyright owner holds the right to create sequels, and the stories told in [Micro Star's] MAP files are surely

sequels, telling new (though somewhat repetitive) tales of [the protagonist's] fabulous adventures." *Id.* (citations omitted).

There is no relevant distinction between the MAP files in *Micro Star* and the updates and tools that the district court held were infringing here. Rimini's Patient Protection and Affordable Care Act ("PPACA") update, which the district court held was an infringing derivative work on summary judgment, serves as an illustrative example. There, Rimini prototyped a PeopleSoft update in the City of Eugene's development environment allowing PeopleSoft users to generate a new tax form required to comply with the Affordable Care Act. 2-ER-256. Just like the MAP files were designed to interact with and extend the functionality of the game, that update "was designed to interact with PeopleSoft, and Rimini's customers would access the new update by signing into their existing PeopleSoft software." 2-ER-259. Just as the MAP files could not be used with any other game, that PPACA update could only be used with PeopleSoft. 2-ER-256.

Rimini attempts to distinguish *Micro Star* because, in its view, the Court's holding turned on "the incorporation of other expressive, creative elements of the Duke Nukem story" by the MAP files. Rimini Br. 20. As the district court noted, "like with any story, the 'copyright owner holds the right to create sequels.'" 2-ER-258 (quoting *Micro Star* 154 F.3d at 1112); *see also Tr. Co. Bank v. MGM/UA Ent. Co.*, 772 F.2d 740 (11th Cir. 1985) (recognizing a copyright holders' right to create

sequels). Oracle has just as much a right to create sequels to PeopleSoft as Duke Nukem's developer had to create additional levels for that game. A "computer program, whether in object code or source code, is a '*literary work*' and is protected from unauthorized copying." *Apple Comput. Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1249 (3d Cir. 1983) (emphasis added). Therefore, courts do not recognize any distinction between an "audiovisual work," such as a video game, and "functional software" like PeopleSoft. The right to create derivative works extends equally to both. *See Dun & Bradstreet Software v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002) (holding that a defendant consulting company—which provided maintenance services to the licensees of the plaintiff copyright holder— created an infringing derivative work by copying and modifying a copy of the plaintiff's tax program); *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 938 (N.D. Cal. 2009) (holding that the defendant's modification of "Mac OS X to run on a non-Apple computer" was an infringing derivative work). Sequels are required for the PeopleSoft software to function properly. As Rimini concedes, this software needs to be changed at least quarterly to address tax and regulatory changes. Rimini Br. 5.

Just as in *Micro Star*, Rimini's updates and tools, developed and distributed by Rimini, are undoubtedly sequels to PeopleSoft because they add a new "level" of functionality to the PeopleSoft software. For example, the PPACA update gave PeopleSoft the ability to create IRS Form 1095. 2-ER-255. Regardless of whether

these updates and tools expressly contain Oracle code, they incorporate Oracle's expression. Moreover, Rimini's updates and tools do not stand on their own; they would have no use or value without the PeopleSoft software; and Rimini could not have developed them without the PeopleSoft environment.

In another bid to evade *Micro Star*, Rimini argues that this Court's decision in *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965, 965 (9th Cir. 1992), is "dispositive." Rimini Br. 22. *Galoob* is not on point, as the district court repeatedly found. 1-ER-156; 2-ER-259; 7-ER-1259. That case involved a device that could be used with Nintendo game consoles called the "Game Genie," which "allow[ed] the player to alter up to three features of a Nintendo game." 964 F.2d at 967. But the Game Genie's "effects [were] temporary," and it did not "alter the data that is stored in the game cartridge." *Id*. Neither the images displayed when a user initiated the Game Genie nor the Game Genie itself was a derivative work because "[t]he audiovisual displays generated by combining" the game with the player's choices "were not incorporated in any permanent form." *Micro Star*, 154 F.3d at 1111. The "concrete and permanent form" requirement is separate and distinct from the "substantial incorporation" requirement, and subsequent Ninth Circuit decisions have understood *Galoob* to only cover the former. *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1161 (9th Cir. 2007) (describing *Galoob* as holding that "a copyright holder's right to create derivative works is not infringed

22

unless the alleged derivative work incorporates a protected work in some concrete or permanent form" (quotation omitted)).  Here, one of the few facts undisputed throughout more than 14 years of litigation is that Rimini's updates and tools exist in a concrete and permanent form.

But there are still further distinctions between Rimini's infringing updates and tools and the Game Genie.  While Rimini's updates and tools were designed to work with PeopleSoft only, the Game Genie was designed to operate with the Nintendo system, not any particular game. *Galoob*, 964 F.2d at 967.  Further, unlike the Game Genie, which did not actually alter the software code of any particular game, *id.*, Rimini's updates and tools are designed to permanently alter and extend Oracle's PeopleSoft software, 1-ER-156.  And, whereas in *Galoob*, the gamers themselves initiated and controlled the interaction between the allegedly infringing device and the copyrighted games, 964 F.2d at 967, Rimini engineers created its updates and automated tools using Oracle's tools, 1-ER-156.  *Galoob* is inapposite.

The district court's holding that Rimini's updates and tools are infringing derivative works is consistent with both general principles of copyright law and a straightforward application of this Court's precedent.  Rimini's attempt to paint the district court's decision as "egregious" and anomalous, Rimini Br. 23, as well as its

(and amici's) parade of horribles, ring hollow. *Micro Star* has been the law for over 25 years, and the software industry is thriving.[2]

### C.    Rimini's derivative works are not licensed.

As a last-ditch attempt to save its infringing content, Rimini incorrectly argues that "even if the Rimini written PeopleSoft updates were derivative works … they would be licensed."  Rimini Br. 26.  Although the district court held at summary judgment that, when Rimini first created an update for the City of Eugene, the update combined with the client's environment was a derivative work, the court went on to make clear that making the update for, and distributing it to, other clients was infringing.  2-ER-260.  None of the creation and distribution of the derivative works the district court found Rimini liable for was licensed because, in each case, Rimini was distributing an infringing update prototyped for other customers.

Stretching the district court's holdings, Rimini points to language in certain PeopleSoft licenses allowing licensees to "modify or merge the Software with other

---

[2] Rimini's purported examples bear no relationship to the updates and tools the district court determined were derivative works, and there is no basis to believe they would be impacted by the district court's rulings.  There is nothing about the district court's decision that should impact general tools like programming languages or operating systems.  The district court did not hold that Rimini's updates and tools were derivative works simply because they were operable with PeopleSoft; it held that they were designed to both modify and extend the functionality of PeopleSoft itself—a software that Rimini concedes "requires regular updates."  Rimini Br. 5. That makes Rimini's updates' use and application very different from writing a document on a word-processing program.  Moreover, unlike the Game Genie in *Galoob*, Rimini concedes that its tools and updates are stored in a permanent form.

software." Rimini Br. 25-26. But Rimini has never argued that the license language it now relies on allowed a customer to create derivative works; therefore, it has forfeited that argument. *Indep. Towers*, 350 F.3d at 929.

In any event, Rimini fails to explain how this language could possibly override other language in the licenses that any use of the PeopleSoft software must be "*solely for Licensee's internal data processing operations*"—the prohibition of cross-use. 2-ER-255 (emphasis added). At summary judgment, the district court held that Rimini's creation of an update violates this prohibition if "Rimini was 'prototyping' the individual update" and "planning on sending that update to other Rimini clients." 2-ER-260. Here, the district court held that all of the updates at issue were prototyped in a customer environment for use with other customers. 1-ER-155-56. That ruling was consistent with the district court's summary-judgment finding, issued more than a decade ago, that Rimini infringed Oracle's copyrights by developing an update in one client's environment for use by another client. *See Oracle v. Rimini*, 6 F. Supp. 3d 1086, 1096-98 (D. Nev. 2014).

There are also distribution restrictions, applicable to many of the Oracle customer environments that Rimini used to develop its infringing PeopleSoft updates, that further demonstrate why Rimini's conduct was unlicensed and infringing. *See* Rimini Br. 27. This language provides that:

> Licensee may share modifications with other customers only through PeopleSoft Forum, Case subject to PeopleSoft's right to modify and monitor

> modifications distributed through PeopleSoft Forum. Except as stated above, Licensee shall have no rights to market or distribute modifications.

1-ER-67-69. Rimini's conduct in distributing numerous updates to other customers (not through the PeopleSoft forum) violated this language in these licenses as well. Rimini incorrectly asserts that these distribution restrictions are only "covenants" that can be enforced through contract law. For the same reason the district court held that a breach of the "internal data processes" restriction in the PeopleSoft licenses gave rise to a copyright violation, these distribution restrictions are "part of the overall section of the license designed to limit the ways in which a licensee can utilize and copy the copyrighted software." 2-ER-255. This provision is also "grounded in an exclusive right of copyright," *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010)—Oracle's exclusive right to create and distribute derivative works. *See* 17 U.S.C. §§ 101, 106.

Finally, Oracle did not disclaim ownership of the infringing updates in certain of its license agreements, as Rimini asserts. Rimini Br. 26. The language Rimini cites, from only a few legacy PeopleSoft agreements, does not support Rimini's argument. It states that "Licensee shall only have title in such modification that remains after PeopleTools has been separated from the modification." 9-ER-1989 ¶ 4.1. Nearly all of Rimini's modifications were made with PeopleTools, *see* 1-SER-56-57, and Rimini adduced no evidence at trial as to what portion, if any, of these updates would remain after PeopleTools is separated from them. Moreover,

Rimini's infringing updates were the result of cross-use, and therefore, are infringing for that independent reason. 1-ER-152. The specific PeopleSoft licenses that Rimini cites provide, in the same paragraph, that "Licensee shall use Software modifications created by Licensee *solely for its internal use in accordance with the terms of this Agreement*." *See, e.g.*, 9-ER-1974 § 4.1 (emphasis added). Additionally, Rimini does not even affirmatively link these license agreements to any of the customer environments that it used to develop its infringing PeopleSoft updates—nor did it do so below. Therefore, even if the Court were to agree with Rimini that this license provision is relevant, Rimini has not developed its argument sufficiently to show whether any of the customers whose environments in which Rimini prototyped its updates had this language in their Oracle licenses.

Because Rimini's updates and tools are unlicensed derivative works, the Court should affirm the district court's holding.

## II. The District Court Correctly Struck Rimini's Section 117(a) Defense.

At the start of this case, Rimini attempted to avoid Oracle's copyright-infringement counterclaims by asserting that its otherwise-infringing copying was an "essential step" in servicing "owners" of Oracle software. 7-ER-1458 (citing 17 U.S.C. § 117(a)). Oracle moved to strike this affirmative defense because Rimini's "customers license, rather than buy, Oracle's software" and thus are not covered by Section 117(a). 2-SER-404. Applying *Vernor*, 621 F.3d 1102, the

district court agreed with Oracle. 2-ER-304-07. Rimini's customers are not "owners" of Oracle software copies, and, even if they were, Rimini's extensive copying would not satisfy the other statutory requirements. This Court should affirm.

## A. Binding circuit precedent forecloses Rimini's Section 117(a) defense.

Section 117(a) allows an "*owner* of a copy of a computer program" to "authorize the making of another copy or adaptation of that computer program" if the "new copy or adaptation is created as an *essential step* in the utilization of the computer program in conjunction with a machine and that it is *used in no other manner*." 17 U.S.C. § 117(a) (emphases added). This Court in *Vernor* correctly interpreted that plain language. Because the district court correctly applied *Vernor*, its dismissal of Rimini's essential-step affirmative defense should be affirmed.

### 1. *Vernor* sets the standard for determining ownership under Section 117(a).

The Court in *Vernor* addressed the issue presented here: whether a "software user is a licensee rather than an owner of a copy" for purposes of Section 117(a)'s essential-step affirmative defense. 621 F.3d at 1111. After covering the existing precedent on "[o]wners vs. licensees," *see id.* at 1108-11, the Court clarified that, in the Ninth Circuit, "a software user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2) significantly

restricts the user's ability to transfer the software; and (3) imposes notable use restrictions," *id.* at 1111. The Court concluded that, because the copyright owner "reserved title to [software] copies and imposed significant transfer and use restrictions … its customers are licensees of their copies of [software] rather than owners." *Id.* at 1112. Since then, this Court has repeatedly reinforced *Vernor*'s application in the software-licensing context—including in dicta in *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1180-83 (9th Cir. 2011). *See also Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1078 (9th Cir. 2015) (reinforcing *Vernor*); *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1156 (9th Cir. 2011) (same).

### 2. The district court properly applied *Vernor* and found that Oracle's licensees do not "own" its software copies.

Applying *Vernor*, the district court held that Oracle's licensees are not "owners" of their copies of Oracle software and Rimini therefore cannot assert that its copying was an "essential step" in servicing its customers. 2-ER-305 (citing *Vernor* and noting "only an 'owner of a copy' may assert a Section 117(a) defense"). The district court did not—as Rimini claims (at 29)—categorically bar *all* software licensees from invoking this defense.[3] Instead, the district court held that "Section 117(a) does not apply *to the present action* because Oracle's customers only license,

---

[3] In *Adobe Systems*, this Court confirmed that *Vernor* does not categorically bar all software licensees from invoking Section 117(a) because "some purported software licensing agreements may actually create a sale." 809 F.3d at 1078. As explained *infra*, however, Oracle's licenses do not sell software copies to customers.

rather than buy, Oracle's copyrighted software." 2-ER-305 (emphasis added). That is correct because Oracle (1) specifies that its customers are granted a license to use Oracle software; (2) significantly restricts the licensee's ability to transfer the software; and (3) imposes notable use restrictions on the software. *See Vernor*, 621 F.3d at 1111.

When attempting to assert its Section 117(a) affirmative defense, Rimini acknowledged that "Oracle licenses, rather than sells, its enterprise software." 2-SER-378-79 (citing 2-SER-376-88). And since then, Rimini has repeatedly admitted that "Oracle does not sell ownership rights to its software or related support products to its customers. Oracle's customers purchase licenses that grant them *limited rights* to use specific Oracle software programs, with Oracle retaining all copyright and other intellectual property rights in these works." 1-SER-249 ¶ 37 (emphasis added) (admitting 2-SER-298 ¶ 37); *accord* 7-ER-1451 ¶ 22 (admitting 2-SER-415 ¶ 22). Rimini's concessions alone indicate the district court was correct to conclude that Oracle licensees are not "owners" under the controlling test from *Vernor*.

Rimini has never even attempted to rebut this analysis under *Vernor*—not before the district court in 2015, nor before this Court now. Rimini instead points this Court to various unrelated considerations. Rimini Br. 35 (citing D-00124 (9-ER-1888), P-05567 (10-ER-2083), and P-02276 (10-ER-2056-57)). But Rimini ignores that consideration of even the sampling of licenses admitted at trial shows

that Oracle's licenses grant customers limited rights to use—not broad rights to own—Oracle's software.

Take the City of Eugene's PeopleSoft license, for example. Through that license agreement, Oracle grants the City "a perpetual, non-exclusive, non-transferable license to use the licensed Software, solely for [the City of Eugene's] internal data processing operations." 10-ER-2056 § 1.1. The license provides extensive exclusions, including against "transfer to any third party," and restricts disclosure to only employees and consultants under nondisclosure obligations. 10-ER-2056 § 2.1(c), 10-ER-2057 § 4.2. It prohibits assignment without Oracle's consent. 10-ER-2058 § 13. And it expressly provides that Oracle "retains title to all portions of the Software and any copies thereof." 10-ER-2057 § 4.1. The license could not be any clearer in (1) specifying that the City is granted a license, not ownership; (2) significantly restricting the City's ability to transfer the software; and (3) imposing notable use restrictions on the software. *See Vernor*, 621 F.3d at 1111.[4]

---

[4] The other two licenses Rimini cites, D-00124 (OMA) and P-05567 (OLSA), are not specific to PeopleSoft but contain substantially similar restrictions. *See, e.g.*, 9-ER-1888 § 2.1 ("non-exclusive, non-assignable, royalty free, perpetual (unless otherwise specified in the order), limited right to use the Programs and receive any Program-related Service Offerings You ordered solely for Your internal business operations"), 9-ER-1889 § 4 ("Oracle or its licensors retain all ownership and intellectual property rights to the Programs, Operating System, Integrated Software and anything developed or delivered under the Master Agreement."); 10-ER-2083 § C ("the nonexclusive, non assignable, royalty free, perpetual (unless otherwise specified in the ordering document), limited right to use the programs and receive any services you ordered solely for your internal business operations and subject to

Oracle's customers are not "owners" of copies of Oracle software for purposes of Section 117(a).

### 3. Applying *Vernor* does not create a circuit split.

Rimini incorrectly claims that affirming the district court's ruling would create a circuit split with the Second Circuit. In *Vernor*, however, the Court rejected this very argument: "Vernor contends that reversing the district court will create a circuit split with … *Krause v. Titleserv, Inc.*, 402 F.3d 119, 124-25 (2d Cir. 2005). We disagree." *Vernor*, 621 F.3d at 1111.

*Vernor* explained why there is no conflict with *Krause*, and that reasoning applies with equal force here: "In *Krause*, unlike here, the parties did not have a written license agreement, the defendant-employer had paid the plaintiff-employee significant consideration to develop the programs for its sole benefit, and the plaintiff had agreed to allow the defendant to use the programs 'forever,' regardless of whether the parties' relationship terminated." *Vernor*, 402 F.3d at 124-25 (emphases added). Oracle and its licensees have detailed, written license agreements that place significant restrictions on the licensees' use of the programs. Further,

---

the terms of this agreement"), 10-ER-2083 § D ("Oracle or its licensors retain all ownership and intellectual property rights to the programs. Oracle retains all ownership and intellectual property rights to anything developed and delivered under this agreement resulting from services. You may make a sufficient number of copies of each program for your licensed use and one copy of each program media.").

Oracle was not in an employer-employee relationship with its licensees, and none of the programs at issue was developed for a licensee's "sole benefit." And while Oracle licenses are perpetual, those licenses can be terminated for failure to adhere to the licensing restrictions. Not only is *Vernor* binding precedent that required striking Rimini's essential-step defense, but *Vernor* considered and rejected the very circuit-split argument that Rimini makes here.

Likely recognizing that *Vernor* is fatal, Rimini wrongly claims that *UMG* implicitly overruled *Vernor*'s standard in exchange for *Krause*'s. *UMG* did no such thing. Instead, *UMG*—a first-sale case about promotional CDs not subject to written licenses—reinforced *Vernor*'s essential-step application in the software-licensing context. Analyzing *Vernor*, the Court found that "software users who order and pay to acquire copies are in a very different position from that held by the recipients of UMG's promotional CDs." *UMG*, 628 F.3d at 1183. For, unlike UMG, which had "virtually no control over the unordered CDs it issues because of its means of distribution, and … no assurance that any recipient has assented or will assent to the creation of any license or accept its limitations," software licensors like Oracle often enter into extensive, written license agreements that substantially restrict the licensees' ability to use the software. *Id.* Whatever *UMG* has to say about ownership outside the software-licensing context, *UMG* and later Ninth Circuit precedent are clear that *Vernor* still applies to ownership within the software-licensing context.

*See id.*; *Apple*, 658 F.3d at 1156 (reiterating *Vernor*'s test for "distinguishing between a software licensee and an owner of a copy"); *Adobe Sys.*, 809 F.3d at 1078 (similar).

Finally, limiting Section 117(a)'s essential-step defense to owners of software does not violate the Copyright Act. Licensing agreements like Oracle's are "firmly rooted in the history of copyright law." *Apple*, 658 F.3d at 1159. "While copyright owners may choose to simply exclude others from their work … courts have long held that copyright holders may also use their limited monopoly to leverage the right to use their work *on the acceptance of specific conditions*"—which is exactly what Oracle does when licensing its software. *Id.* (emphasis added).

## B. Rimini's copying for other customers extends beyond an "essential step."

Oracle licensees are not owners under the *Vernor* test, but even if they were, and even if Rimini's copying was created to be an "essential step,"[5] Rimini's conduct would not qualify because it does not create copies "used in no other manner" than the proper utilization of the software. 17 U.S.C. § 117(a). Rimini's infringing cross-use of both Database and Peoplesoft, violation of the PeopleSoft internal data processing and facilities restrictions, and use of other unlicensed Database copies all

---

[5] Oracle does not concede any of Rimini's infringing copying constitutes an "essential step" under Section 117(a).

went well beyond what is "essential" to "utiliz[ing] the computer program" Oracle customers are licensed to utilize. *Id.*

Rimini does not attempt to reconcile its liability with Section 117(a)'s essentiality requirement. Unsurprisingly, Oracle is not aware of any authority holding that a scheme like Rimini's business model, which employs massive and unlicensed copying, is authorized under the essential-step defense. Even *Krause* cuts against Rimini here. Although the Second Circuit found, under the distinguishable set of facts, that the copy owner there caused "no harm whatsoever to [the copyright owner's] enjoyment of his copyright," it acknowledged that "[a] different scenario would be presented if [the owner of the copy's] alteration somehow interfered with [the copyright owner's] access to, or ability to exploit, the copyrighted work that he authored." *Krause*, 402 F.3d at 129. Rimini's entire business model involves infringing Oracle copyrights so Rimini can offer cut-rate support and lure away Oracle customers, which necessarily interferes with Oracle's ability to exploit the copyrighted works it spent billions of dollars to create. *See, e.g.*, 1-ER-160-64; 1-ER-192-97.

Because Oracle licensees do not own copies of Oracle software, and because Rimini's infringing actions extend well beyond what is essential to servicing a particular customer, the Court should affirm the inapplicability of Section 117(a).[6]

## III. The District Court Correctly Found That Rimini Infringed Oracle's Database and PeopleSoft Software Copyrights.

### A. Rimini infringed Oracle Database copyrights.

The district court correctly held that Rimini infringed Oracle's copyrights in Oracle Database. Rimini takes a phrase from the bench order—that Rimini had "copies of Database on its own computer systems," 1-ER-168—out of context to suggest that the district court's infringement finding as to Database was based on the conclusion that the Database licenses have a facilities restriction. Rimini Br. 38. This sloppy argument ignores the numerous rulings in this ongoing litigation—upon which the district court relied—finding Rimini's infringement of the Database copyrights.

As an initial matter, the district court held that Rimini infringed the Database copyrights in three ways: (1) Rimini maintained "18 gap customer environments on [Rimini's] systems during the pertinent period that included copies of Oracle Database"; (2) Rimini made infringing copies of Database when it "migrated"

---

[6] Even if the Court agreed with Rimini, it could, *at most*, vacate and remand for further fact finding. Such fact finding however, is unnecessary, given Rimini's admissions and the clear language of the license agreements admitted at trial.

customer environments; and (3) Rimini made infringing copies of Database as part of its infringing cross-use. 1-ER-168-73. Rimini does not present any arguments about the second and third categories of infringement; instead, it focuses on the 18 gap customer environments that resulted in illicit copies of Database on Rimini's systems. But Rimini's argument is forfeited because, as the district court recognized, Rimini did "not address the creation of 18 environments theory." 1-ER-168.

Nonetheless, Rimini's argument as to the 18 environments is meritless. Rimini admits that these PeopleSoft environments were created before "Process 2.0" was implemented using support processes substantially identical to those found infringing in *Rimini I*. *See* 2-ER-228-29; 5-ER-699. As this Court recognized in *Rimini I*, "the district court granted Oracle summary judgment on its copyright infringement claim that 'Rimini copied Oracle's copyright protected software when it built development … environments for a number of Rimini customers using Oracle Database.'" *Rimini I*, 81 F.4th at 855. And on appeal in *Rimini I*, "Rimini waived the defense that the OLSA authorized Rimini's actions." *Id.* The district court properly applied those prior rulings to the copies of Database in the 18 gap customer environments, because they resulted from the exact same conduct the district court held was infringing in *Rimini I*. 1-ER-168.

Attempting to escape these prior holdings, Rimini points to the contempt appeal, where this Court held that Rimini did not violate the *Rimini I* permanent injunction when it downloaded a Database file received from a customer. *Rimini I*, 81 F.4th at 855. But the Court did not hold that Rimini was allowed to make the wholesale copies of Database it made here. Instead, the Court recognized that the situation presented in the contempt appeal was "strikingly different." *Id*. In contrast, Rimini's conduct as to the 18 gap customer environments is that which the district court held infringing in *Rimini I*, and as to which Rimini waived its right to appeal.

## B. Rimini infringed Oracle's PeopleSoft copyrights through cross-use.

Rimini appeals some of the district court's copyright-infringement findings that Rimini's support processes cross-used PeopleSoft in violation of the license requirement that software copies can be made only if they are "solely for [the] internal data processing operations" of the licensee. *See, e.g*., 9-ER-1888. Rimini begins its argument by once again defining cross-use "myopically," distorting this Court's and the district court's prior holdings. *Rimini I*, 81 F.4th at 853. This Court repeatedly has made clear that cross-use occurs anytime Rimini engages in "the creation of development environments, under color of a license of one customer, to support other customers." *Rimini I*, 879 F.3d at 956. "*Any work* that Rimini performs under color of a license held by a customer for other existing customers" is cross-use, including work for "for unknown, future customers." *Id*. at 957

(emphasis added). And "it makes no difference whether the development environment was generic and locally hosted as in *Rimini I* or client-specific and remotely accessed as here." *Rimini I*, 81 F.4th at 853.

The district court correctly held that "despite all of Rimini's protestations to the contrary, most of Rimini's PeopleSoft support processes used during the [*Rimini II*] period … were built on impermissible cross-use." 1-ER-152. Rimini challenges only two aspects of the district court's cross-use findings: it contends that (1) the district court improperly concluded that the use of its automated tools (CopyRSIFileFromClientToClient, GenDiff/ApplyDiff, TransferFiles, GenDataChanges, ApplyUpdate, and Dev Review) infringed Oracle's PeopleSoft copyrights and (2) the district court erred in concluding that Rimini's delivery of updates tested in one client's environment to other clients, without testing in that other client's environment, was indicative that Rimini infringed the PeopleSoft copyrights. Rimini Br. 41-47. These arguments are meritless.

### 1. Rimini's use of its automated tools constitutes impermissible cross-use.

Rimini conflates the use of its automated tools, which the district court held were infringing, and the use of technical specifications, which the district court held were not. Rimini Br. 42. Rimini's automated tools are fundamentally different than its technical specifications.

Rimini's automated tools serve as "engines for impermissible cross-use," 1-ER-52, by allowing Rimini engineers to enter one customer environment (Client A's), prototype an update, and then automatically send it to numerous other customers (Clients B and C) without making further specific modifications in those other environments. 1-ER-54. Through that process, the automated tools create multiple unlicensed copies of PeopleSoft. *See* 1-ER-52-56.

Contrary to Rimini's contentions, Rimini Br. 42, the copies created by automated tools are not the "same" as the copies Rimini would make if it were providing support to that customer manually. For example, when Rimini uses one of its tools—GenDiff/ApplyDiff—to propagate changes that Rimini makes to Oracle source code files in a prototype environment to multiple other environments, Rimini makes at least six additional copies of the Oracle source code in the prototype environment. 1-ER-61. Those copies are made after Rimini has prototyped and tested an update to the client's software. *Id.* As the district court correctly held, these copies are plainly an example of cross-use because the copies made in that process do not benefit Client A at all. Client A does not require these copies because Client A "already has the modified Oracle source code file." *Id.* The district court found that Rimini used this process thousands of times, creating thousands of unlicensed copies. 1-ER-62.

By contrast, the district court found that the technical specifications presented at trial contained a *de minimis* amount of copied Oracle code.  1-ER-34.  The district court viewed the technical specifications Rimini's engineers drafted for both its PeopleSoft and EBS support as written notes documenting "the steps required to effectuate the update."  1-ER-33.  Whereas, as the district court found, "[t]he plan for AFW and Rimini's other Automated Tools was to automate impermissible cross-use of remote customer environments."  1-ER-53 ¶ 107.  Thus, the district court's holdings on these practices are consistent.

Finally, Rimini fails to address or appeal the district court's additional finding that, regardless of the number of copies of Oracle software that are made during the operation of Rimini's automated tools, Rimini developed the tools themselves through cross-use of Oracle software and used those tools to facilitate cross-use.  *See* 1-ER-160.  That is an independent basis for affirming the district court's infringement holding as to the automated tools.

> ### 2. Rimini's "outright" delivery of updates proves that Rimini engaged in cross-use.

In a slight variation of its prior argument, Rimini claims the district court held that Rimini engaged in cross-use when providing an update "outright" to other customers, without testing it in their environments first.  Rimini Br. 46.  But the district court properly recognized that Rimini's distribution of an update "outright" demonstrates that it engaged in cross-use because Rimini necessarily used the first

client's environment to prototype the update for multiple clients—not "solely" for the first client's "internal data processing operations." As the district court recognized at summary judgment:

> If Rimini was "prototyping" the individual update in City of Eugene's environment, that necessarily means that Rimini was planning on sending that update to other Rimini clients. If the update was being created and tested in the City of Eugene's environment, for other customers, the court must find that it was not being developed and created solely for City of Eugene's "internal data processing operations."

2-ER-260. That was consistent with this Court's recognition that there are many types of cross-use and that "*[a]ny work* that Rimini performs under color of a license held by a customer for other existing customers" is cross-use. *Rimini I*, 81 F.4th at 853 (emphasis added) (quoting *Rimini I*, 879 F.3d at 957). The district court also faithfully applied this standard in the bench order and at trial, finding that the evidence showed that Rimini engaged in the same pattern of development— prototyping in one client's environment and then distributing to others without modification—for the PeopleSoft updates that were presented at trial. *See* 1-ER-47 ("Rimini offered no evidence that it performed any further development work in customer environments that had received 'files' or 'updates' that Rimini developed through cross-use in a prototype customer's environment."). The Court should affirm this aspect of the district court's decision as well.

## IV. The District Court Correctly Held That Rimini Violated The Lanham Act.

After reviewing extensive evidence regarding Oracle's and Rimini's support services, the district court "agree[d] with Oracle that Rimini made three categories of false statements in its commercial advertising and promotion" and thus violated the Lanham Act, 15 U.S.C. § 1125. 1-ER-85. On appeal, Rimini does not argue that the district court applied the wrong standard for assessing any of these categories. Rimini challenges only the district court's holding that Rimini's "statements that Oracle's security offering was inadequate and that Rimini's security offering was superior," 1-ER-85, were literally false. *See* Rimini Br. 49-54.[7] Because the district court's fact findings support its holding that Rimini's false and misleading statements violate the Lanham Act, *see* 1-ER-88-102, this Court should affirm the Injunction's prohibition on Rimini's enumerated unlawful statements "or any substantially similar statements in marketing materials, advertisements, or communications with customers or potential customers," 1-ER-6.

---

[7] Rimini does not challenge the district court's conclusions that the other two categories of statements—"statements that Rimini had ceased using the support processes that were at issue in [*Rimini*] *I* and was honoring Oracle's copyrights and licenses" and "statements that Rimini's support offering did not share anything in common with the support offering of TomorrowNow," 1-ER-85—are literally false and thus violate the Lanham Act. Rimini also does not challenge the district court's order (at 1-ER-7) that Rimini must issue a corrective press release to inform customers and prospective customers that it made false and misleading statements in its advertisements and marketing campaigns.

A party commits a false-advertisement offense under Section 43(a) of the Lanham Act by, *inter alia*, making "a false statement of fact … in a commercial advertisement about its own or another's product." *Skydive Ariz., Inc. v. Quattrochi*, 673 F.3d 1105, 1110 (9th Cir. 2012). To demonstrate falsity, "a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *accord Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("[A] false advertising cause of action under the Act is not limited to literal falsehoods; it extends to false representations made by implication or innuendo.").

Whereas false advertising is actionable, mere "puffery" is not. *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665, 672 (9th Cir. 2023). "Puffery," or "Puffing," is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." *Southland*, 108 F.3d at 1145 (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.04[4][d] at 27-52 (3d ed. 1994)). "[P]roduct superiority claims that are vague or highly subjective often amount to nonactionable puffery." *Id.* But "misdescriptions of specific or absolute characteristics of a product are actionable."

*Id.* (citation omitted).  If a customer is deceived, or is likely to be deceived, by a misleading statement, the statement is not puffery.  *See Cook*, 911 F.2d at 246.

When assessing whether a statement violates the Lanham Act, courts "must look to the totality of the circumstances." *Enigma*, 69 F.4th at 672 (citation omitted). Even if a statement could be "vague, unspecified boasting" if "viewed in isolation," it may be actionably false and misleading "[i]n context." *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 39 (1st Cir. 2000); *accord Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993).

### A. Rimini's commercial statements about Rimini's and Oracle's relative security offerings are false and misleading.

Each of Rimini's statements about Oracle's and Rimini's relative security offerings is literally false.  *See* 1-ER-181-82.  When accepting the district court's fact findings, none of which Rimini can (or even has attempted to) show are clearly erroneous, there is no basis on which to vacate its Injunction against making the specified misleading statements in future commercial advertisements.

### 1. Rimini's statements about software patching are literally false.

Most of the statements enjoined and challenged on appeal relate to Oracle's security patching (released in bundles called critical patch updates ("CPUs")) and the third-party virtual patching software that Rimini resold to some of its customers.

Specifically, the district court enjoined Rimini from making the following, or substantially similar, statements about software patching:

- Security professionals have found that traditional vendor security patching models are outdated and provide ineffective security protection;

- Oracle's CPUs provide little to no value to customers and are no longer relevant;

- Oracle's CPUs are unnecessary to be secure;

- It is not risky to switch to Rimini and forego receiving CPUs from Oracle;

- Once an Oracle ERP platform is stable, there is no real need for additional patches from Oracle;

- If you are operating a stable version of an Oracle application, especially with customizations, you probably cannot apply or do not ever need the latest patches;

- Virtual patching can serve as a replacement for Oracle patching; and

- Virtual patching can be more comprehensive, more effective, faster, safer, and easier to apply than traditional Oracle patching.

1-ER-6-7; *accord* 1-ER-90-91. As the district court explained, each of these statements is demonstrably false because Oracle's CPUs *are* necessary, and virtual patching *is not* an adequate alternative.

Although Rimini tells customers and prospective customers that virtual patching can displace Oracle's CPUs, Rimini knows that is false. *See* 1-ER-94-97 (citing, *inter alia*, 2-SER-464-73 (Ravin recognizing that Rimini "will never have a 1:1 replacement for CPUs" and that its "CPU Replacements CANNOT be 100%

alternatives")).  On appeal, Rimini does not deny the misleading nature of its security claims.  Instead, Rimini argues that its claims about providing an adequate or even superior security offering are "generalized assertions" that are too "high level" and "subjective" to be "capable of being proven true or false."  Rimini Br. 51-52.

The district court's findings, supported by record evidence, show the opposite. Directly contrary to Rimini's advertisements, the security community agrees that "security patching is essential" because unpatched copies of Oracle software "grow increasingly vulnerable to security breaches over time."  1-ER-92 (citing 1-SER-19-20; 1-SER-61-64).  "Unlike [Oracle's] security patches, which fix security problems at the software code level, [Rimini']s 'virtual patching' does not and cannot actually fix the underlying software vulnerabilities."  1-ER-93 (citing 1-SER-62; 6-ER-1000-02).  So while "[v]irtual patching can supplement, but not replace, the security offered by traditional patching," it "is *in no way* more comprehensive, more effective, or safer than vendor patching."  1-ER-93 (emphasis added) (citing 1-SER-62-64; 6-ER-1001-02).  Contrary statements that Rimini's virtual patching can replace Oracle CPUs—or be even more comprehensive, more effective, or safer than Oracle CPUs—are demonstrably misleading and literally false.

### 2. Rimini's statements about holistic security are literally false.

The same is true of Rimini's statement that "Rimini offers 'holistic security' solutions for Oracle software for enterprises."  1-ER-7.  The term "holistic" is not,

as Rimini insinuates, a vague or subjective synonym for "good." *See* Rimini Br. 49, 52. It is a term of art used by the security industry "to refer to a comprehensive approach to security at all layers of a system," "including to the software source code." 1-ER-99 (citing 1-SER-61-64; 1-SER-42; 1-SER-14). Rimini's own expert agreed that Rimini cannot meet this industry standard because it does not include the necessary vendor patching that Oracle's CPUs include. 1-ER-99 (citing 1-SER-19). Thus, the district court correctly concluded, as a matter of fact, that "Rimini's security offering is not 'holistic' or 'multilayered,'" *id.*, and, as a matter of law, that any statement to the contrary is literally false. *See, e.g.*, *Enigma*, 69 F.4th at 672 (enjoining false statements that "employ terminology that is substantively meaningful and verifiable" in the technical context).

### 3. Rimini's statements about Oracle's and Rimini's relative security are literally false.

The final three security-related statements regarding Oracle's and Rimini's relative security are also demonstrably false. For that reason, the district court enjoined Rimini from stating in commercial advertisements that:

- Rimini Security Support Services helps clients proactively maintain a more secure application compared to Oracle's support program which offers only software package-centric fixes;

- Rimini's Global Security Services [("GSS")] can pinpoint and circumvent vulnerabilities months and even years before they are discovered and addressed by the software vendor; and

- Rimini provides more security as compared to Oracle.

1-ER-7.

As explained above, Rimini's virtual patching is demonstrably *less* secure than Oracle's CPUs—disproving the statement that "Rimini provides more security as compared to Oracle." In discussing the comparison, the district court found that "[b]ecause Rimini cannot provide Oracle licensees with security patches, once a customer leaves Oracle support for Rimini, no customer using Rimini's offerings can have any future vulnerability fixed unless they return to Oracle support" and appropriately concluded that "Rimini's security offerings to Oracle licensees do not help licensees maintain a more secure application than Oracle's CPUs because they do not actually remove any security vulnerabilities." 1-ER-99-100.

That conclusion is supported by specific findings about GSS's inferiority. For example, "[c]ontrary to Rimini's assertions, Rimini's GSS cannot 'pinpoint' future security vulnerabilities before they even exist because that is not technically feasible." 1-ER-101 (citing 1-SER-45-46). But even if Rimini's GSS were able to pinpoint a vulnerability in advance, the statement would still be false because, as discussed above, Rimini cannot provide security patches and thus cannot truly "circumvent," "protect against," or "address" any vulnerabilities. And Rimini presented "no evidence" of GSS's other supposed superiorities. 1-ER-101 (citing 1-SER-30-33; 6-ER-964-66). Because the evidence shows these statements are

literally false, the district court was right to enjoin Rimini from making similar statements in the future.

### 4.    Rimini's false statements are not mere puffery.

Rather than disproving their falsity, Rimini argues that its misleading statements are mere opinions or "puffery." Rimini Br. 48. But the cases it relies upon show only that vague statements *unlikely* to mislead customers are unactionable—not literally false statements that are *actually* misleading. *See, e.g.*, *Cook*, 911 F.2d at 246 (holding "[t]he statement that 'we're the low cost commercial collection experts' and any implication that NCC has comparable services to attorneys at lower rates are general assertions of superiority rather than factual misrepresentations" because "it is beyond the realm of reason to assert that a reasonable consumer would interpret this as a factual claim upon which he or she could rely"); *Southland*, 108 F.3d at 1145 (distinguishing the unactionable statement "Less is More," which "is precisely the type of generalized boasting upon which no reasonable buyer would rely," from the actionable "50% Less Mowing Claim," which "is a specific and measurable advertisement claim of product superiority based on product testing and, as such, is not puffery"). The statements here are actionable based on the same reasoning this Court applied in *Enigma*: in "the context in which [the statements] appear[,]" Rimini's statements are false. 69 F.4th at 672

(citation omitted); *see, e.g.*, 1-ER-92 (citing 1-SER-43-47; 1-SER-61-64; 1-SER-23-29; 2-SER-449; 1-SER-19-20).[8]

Where, as here, the defendant intentionally misleads customers, *see* 1-ER-142-85, a plaintiff is entitled to a presumption that customers were actually deceived or misled. *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995). Rimini does not refute that presumption. In fact, Rimini's own statements reinforce it. Relying on expert testimony, the district court concluded that "Rimini's false statements about the nature of its support practices … caused customers to contract with Rimini and terminate Oracle support or to remain with Rimini and decline to return to Oracle support." 1-ER-142-43 (citing 1-SER-48 at 1741:8-22; 1-SER-36 at 1809:16-21); *accord* 1-ER-180. Rimini has long acknowledged this. For example, Rimini's Executive Vice President admitted that making these false and misleading commercial statements enabled Rimini "to grow by large amounts year over year." 1-ER-178 (citing 2-SER-459-63 ("We have to bullshit our way through a lot of what we do and we've been doing it successfully for years! … But let's not believe all our own marketing."); 1-SER-39-41 (agreeing that Rimini's "strategy of

---

[8] In *Enigma*, Judge Bumatay dissented from the majority's Lanham Act analysis on First Amendment grounds. *See* 69 F.4th at 679-87. By failing to address any First Amendment implications in its opening brief, Rimini has forfeited the argument that the Injunction violates its free-speech rights. *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018). In any event, "false or unlawful commercial speech" is not protected by the First Amendment, *United States v. Bell*, 414 F.3d 474, 481 (3d Cir. 2005), and "may be prohibited entirely," *In re R.M.J.*, 455 U.S. 191, 203 (1982).

talking to customers in a way that is bigger than Rimini actually has worked quite well" because "the company continues to grow by large amounts year over year")). Having admitted that customers relied on its false statements and failed to show that the district court's fact findings to that effect are clearly erroneous, Rimini cannot show that its statements were unlikely to mislead customers.

Considered alone, each of Rimini's statements is actionably false and violates the Lanham Act. And considered in context, each is part of Rimini's ongoing scheme to defraud customers and operate a business built on infringement of Oracle's copyrights. For both reasons, the district court was correct to enjoin Rimini from making such false and misleading statements in future commercial advertisements and promotions. *See, e.g.*, *United States v. Schiff*, 379 F.3d 621, 630 (9th Cir. 2014) (affirming injunction enjoining fraudulent commercial speech); *United States v. Buttorff*, 761 F.2d 1056, 1066-68 (5th Cir. 1985) (same); *Bell*, 414 F.3d at 479-81 (same).

## V. The Injunction Is Appropriately Tailored To Prevent Rimini's Ongoing Infringement.

Finally, Rimini attacks the Injunction as "overbroad" and aimed at punishing only "*past* infringement." Rimini Br. 54, 56. On the contrary, the Injunction

properly addresses the infringement Rimini has long committed and will continue to commit unless so enjoined.[9]

## A. The Injunction appropriately orders the permanent deletion of infringing files.

The district court expressly "tailored" its Injunction to include "'such terms as it … deem[ed] reasonable to prevent or restrain infringement'" of Oracle's copyrights. 1-ER-3, 1-ER-191 (quoting 17 U.S.C. § 502(a)). Rimini's three assertions of overbreadth are unsupported.

*First,* the district court correctly enjoined the copying and use of any infringing files beginning with an "RS" or "RSI" prefix and required Rimini to delete those in its control. 1-ER-3-5. Rimini's assertion that the RS/RSI files "obviously" include "countless Rimini-created files that contain no Oracle code or expression of any kind, were never at issue in trial, and were never alleged (let alone found) to be infringing" is supported only by a declaration submitted *after* trial and *after* the district court issued its bench order. Rimini Br. 55 (citing 3-ER-370-71, 3-ER-373-

---

[9] When rejecting Rimini's argument in its denial of a stay pending appeal, the district court recognized that even if the Injunction were overbroad, this would be "at least in part a problem of Rimini's own making." 3-ER-323. Before the district court, "Rimini made the strategic choice to argue against any injunction at all instead of weighing in on the precise terms of an injunction that would be equitable given Rimini's conduct—despite clear orders to the contrary." *Id.* Rimini cannot challenge the Injunction's scope now when it declined to timely do so before the district court. *See Fed. Sav. & Loans Ins. Corp. v. Butler*, 904 F.2d 505, 509 (9th Cir. 1990).

74 (Mackereth Decl.)). The Court should disregard these belated assertions that *some* unspecified new category of RS/RSI files that Rimini could have presented at trial, but did not, are non-infringing. But in any event, the declaration is speculative, lacks any specifics about the existence or nature of these supposedly non-infringing files, and is directly contrary to the district court's factual findings. In contrast to Rimini's assertion that the basic function of the automated tool TransferFiles is to "transfer Rimini-written files or documentation from Rimini's systems to clients' environments," the district court found that "Rimini also uses TransferFiles as another way to distribute updates prototyped in one customer's environment to other customers," which "results in impermissible cross-use and is part of its prototype-and distribute model: distribution of a file tested in one customer's environment to other customers," including any purportedly "Rimini written files." *Compare* 3-ER-373 ¶ 31, *with* 1-ER-59-60 ¶¶ 123-24.

*Second,* Rimini incorrectly contends that the Injunction prohibits it from using the "standard" Oracle version of "TAX960ST.SQR," a file that "comes with the original PeopleSoft software that every Rimini client has a license to use." Rimini Br. 55 (emphasis omitted). The Injunction reaches only the Rimini-rewritten versions of TAX960ST.SQR—eventually renamed "RSI960ST.SQR"—not the standard Oracle versions. *See* 1-ER-152 ("The Court finds that *Rimini's RSI rewrite or 'one code for all' files* are infringing reproductions of materials covered by

Oracle's PeopleSoft copyrights … ."); 1-ER-41-43 (describing Rimini's process of creating TAX960ST.SQR/RSI960ST.SQR, including admissions that it mixed new Rimini code with old Oracle code). As Rimini has recognized, the district court found (and Rimini does not challenge) that Rimini's rewrite version of TAX960ST.SQR was the result of it having "rearchitected" the Oracle version "in an infringing manner." 1-ER-346. The district court certainly could, and did, enjoin Rimini's copying and use of this infringing file.

*Third,* Rimini is incorrect that the district court's Injunction and bench order are inconsistent with respect to their treatment of DAT files listed in P-4940 and P-4941. *See* Rimini Br. 56. Although the district court held that Oracle did not prove *all* DAT files were infringing, *see id.*, the district court held that *several* DAT files were infringing. *See* 1-ER-58 (finding that the files listed in P-9578, which includes files listed in P-4940 and P-4941, were the result of cross-use). So, in its Injunction, the district court ordered Rimini to delete those infringing files. 1-ER-5.

The Injunction is not overbroad: it properly requires Rimini to delete its RS/RSI files, rewritten versions of TAX960ST.SQR, and DAT files listed in P-4940 and P-4941—all of which the district court rightly found infringing. Because Rimini's past conduct and the history of this litigation "underscore that Rimini is a recidivist infringer," 1-ER-199, a broad injunction is justified. *See, e.g.*, *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 937 (9th Cir. 2004) ("Getloaded's

belligerent violation of the temporary restraining order and preliminary injunction during the litigation, and its executives' lies in their depositions, justified an especially aggressive prophylactic injunction."); *Excelsior Coll. v. Frye*, 345 F. App'x 241, 244 (9th Cir. 2009) ("The district court did not abuse its discretion in crafting a broad injunction after Frye was found liable for *willful* copyright infringement *and* trade secret misappropriation.").

## B.    The Injunction is aimed at preventing future infringing conduct.

Rimini asks this Court to vacate the Injunction because, according to Rimini, the Injunction is directed solely at past conduct and is unnecessary to address future conduct. Rimini Br. 56. Neither the law nor the facts support Rimini's request. Despite repeatedly being ordered to cease its infringing practices, Rimini continued to violate Oracle's intellectual-property rights through its copying of Oracle software, creation of derivative works, and the like. And, as this Court recently held, Rimini has done so in contempt of court. *Rimini I*, 81 F.4th at 859.

When an infringer has been found to violate a creator's copyrights, the permanent injunction "should, *at a minimum*, encompass the acts found unlawful." *Apple*, 673 F. Supp. 2d at 953, *aff'd*, 658 F.3d 1150. That principle holds true "even if Plaintiffs chose to forgo a damages award." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007).

The district court's order that Rimini delete its infringing files is an appropriate remedy. Although Rimini asserts it is no longer infringing, the district court's findings prove the opposite: Rimini had thousands of infringing files on its system, and it copied and distributed—and continued to access and use—195 infringing copies of PeopleSoft environments on its systems to its customers computer systems or to Windstream's computer systems. 1-ER-24-27, 1-ER-146-53 ("As in *Oracle I*, the evidence admitted at trial tends to show that Rimini's PeopleSoft business model continues to be built on its infringement of Oracle's copyrighted software, even after Rimini's transition to 'process 2.0.'"). Rimini offers three unpersuasive arguments for why it should not have to delete them.

*First*, although Rimini does not challenge the district court's findings that Rimini's since-migrated PeopleSoft software environments were infringing, Rimini nonsensically asserts that those environments and files somehow do not infringe now that they are on the clients' systems. *See* Rimini Br. 57-58. The district court correctly found the opposite: Rimini had created at least 65 infringing copies of PeopleSoft environments on its systems between 2012 and 2014, and Rimini further "infringed Oracle's PeopleSoft copyrights" when it copied those infringing environments, and others found infringing in *Rimini I*, "onto its customers' and Windstream's computer systems and further used those additional copies to build and configure additional PeopleSoft environments." 1-ER-147-48; *see also* 1-ER-

22-23. And contrary to Rimini's eye-popping assertion that "there is no ongoing infringement at issue," Rimini Br. 57-58, Rimini has continued to use those infringing migrated environments for the development and testing of fixes and updates," 1-ER-138; *see also* 1-ER-140 ("Rimini documents and witnesses have explained the time and labor savings that Rimini obtains through … the migration of customer environments full of infringing copies and derivative works of Oracle software and support materials."). All of those copies—including the ones now on the customers' and Rimini's Windstream[10] systems—are infringing. *See* 1-ER-147-51.

Rimini relies on the district court's recognition that Rimini could "rebuil[d]" the environments on the clients' systems. Rimini Br. 58 (quoting 1-ER-169). But that statement was in reference to what Rimini *did not* do, where it "chose to copy environments ruled to be infringing *instead* of rebuilding development and test environments from scratch." 1-ER-169 (emphasis added). Rimini chose to copy infringing environments, which is further infringement, instead of building new, non-infringing ones.

---

[10] Rimini does not appeal the district court's findings that Rimini's continued hosting of PeopleSoft environments on Windstream violates the facilities restriction (and Oracle's copyrights). *See* 1-ER-28-30, 1-ER-151. Thus, it is undisputed that the Injunction's prohibition on Rimini's use of environments hosted on Windstream addresses ongoing harm.

*Second,* Rimini tries to excuse its infringement by arguing that "the *only* way to migrate these environments off of Rimini's systems *required* Rimini to make copies of them." Rimini Br. 57. But the district court correctly rejected this defense on legal grounds—concluding that "the purported technical infeasibility of non-infringing approaches is not relevant to the fair use analysis." 1-ER-172. And it also correctly rejected the assertion on factual grounds—discrediting Mr. Ravin's testimony that deletion instead of migration would have been "catastrophic" because there was "no evidence that Rimini 'even contemplated let alone attempted' any … non-infringing alternatives." 1-ER-25-26 (quoting 1-SER-58). Rimini does not challenge either rejection on appeal.

*Third*, similar to the migrated environments, Rimini argues that there is "nothing infringing about" the rewrite files "as they currently exist on client systems." Rimini Br. 58-59. But Rimini cites no legal or factual support for this assertion. *See id.* The rewrite files are "infringing reproductions of materials covered by Oracle's PeopleSoft copyrights," and further reproductions of these files are further infringement. 1-ER-152-53; *see also* 1-ER-154 ("Rimini's claim that it stopped providing certain of the RSI rewrite files to customers in November 2018 is not a basis to deny injunctive relief as to Rimini's continued reproduction and use of the infringing RSI files."). As with the migration above, Rimini cannot simply copy infringing files to another location and call them non-infringing. Only the

Injunction can put an end to the ten-year sleight of hand Rimini began when it initiated its lawsuit asserting it had ceased infringing Oracle's copyrights.

\*\*\*

Faced with "a classic case … of a past infringement and a substantial likelihood of future infringements," the district court issued a properly tailored permanent injunction under 17 U.S.C. § 502(a). *Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1499 (11th Cir. 1984); *accord Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). This Court should affirm the Injunction in its entirety.

## CONCLUSION

For the foregoing reasons, Oracle respectfully requests that this Court affirm the Injunction.[11]

Dated: April 3, 2024

Respectfully submitted,

*s/ Raechel Keay Kummer*
David B. Salmons
Raechel K. Kummer
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000
david.salmons@morganlewis.com
raechel.kummer@morganlewis.com

---

[11] Because the Court should affirm all aspects of the district court's decision and Injunction as to Rimini's infringing activities, it should also affirm Mr. Ravin's vicarious and contributory liability.

Benjamin P. Smith
Zachary Hill
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000
benjamin.smith@morganlewis.com
zachary.hill@morganlewis.com

Corey Ray Houmand
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
(650) 843-7524
corey.houmand@morganlewis.com

William A. Isaacson
Karen Dunn
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
wisaacson@paulweiss.com
kdunn@paulweiss.com

Richard J. Pocker
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
(702) 382-7300
rpocker@bsfllp.com

*Attorneys for Appellees*
*Oracle International Corporation and*
*Oracle America, Inc.*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

## FORM 17. STATEMENT OF RELATED CASES
## PURSUANT TO CIRCUIT RULE 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number <u>23-16038</u>**

The undersigned attorney or self-represented party states the following:

[x]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** *<u>s/ Raechel Keay Kummer</u>*       **Date** <u>April 3, 2024</u>
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                      *New 12/01/18*
62

**FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number 23-16038**

      I am the attorney or self-represented party.

      **This brief contains 13,672 words,** including <u>zero</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

      I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Raechel Keay Kummer*        **Date** April 3, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                        *Rev. 12/01/22*